COMMONWEALTH *vs.* JOSEPH RICCARD. ·

Suffolk. February 7, 1991. - July 23, 1991.

Present: LIACOS, C J , WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Identification. Evidence,* Identification, Impeachment of credibility, Prior conviction. *Witness,* Credibility. *Practice, Criminal,* Instructions to jury.

At a murder trial, evidence of an improperly suggestive photographic iden-
tification· of the defendant that was the only evidence identifying the
defendant as the murderer should have been excluded, and the defend-
ant was entitled to a new trial. [722-723]
At a murder trial, the judge's erroneous and contradictory instruction on
the jury's use of prior convictions in determining the credibility of wit-
nesses was prejudicial and the defendant was entitled to a new trial.
[723-724]

INDICTMENT found and returned in the Superior Court De-
partment on October 19, 1987.

The case was tried before *Sandra L. Hamlin,* J.

*Bruce Ferg* for the defendant.

*Jane A. Donohue,* Assistant District Attorney, for the
Commonwealth.

LYNCH, J. The defendant appeals from his conviction of
murder in the first degree in the death of Robert Lee
Hughes. The defendant challenges, among other things, the
admission of certain out-of-court evidence and the judge's
charge to the jury regarding the use of prior criminal convic-
tions to impeach the credibility of a witness. We reverse and
remand the case for a new trial.

We recite the evidence in some detail. On the night of
May 19, 1987, the victim, Robert Lee Hughes, was found
lying in a parking lot off LaGrange Street, near lower Wash-
ington Street in Boston, the area known colloquially as the

"combat zone," suffering from stab wounds. He died the following day. The defendant and another man, Robert Kemmitt, were found at a nearby intersection, also suffering from stab wounds. No one witnessed the actual stabbings, and no weapon was found. The bulk of the Commonwealth's case was contained in the testimony of Theresa Hartman, Gerald Hunt, Keith Hicks, and Warren Hawkins, who had witnessed all or part of an altercation involving Hughes, the defendant, and Kemmitt, among others.

Theresa Hartman lived in an apartment on Washington Street, across the street from the Club 66 where she was employed as an exotic dancer and disc jockey. Her apartment was on the second floor, and both windows looked out on LaGrange Street near the corner. Hartman testified that on the night of May 19, 1987, she looked out of her window after hearing loud talking, then loud yelling and screaming for about fifteen minutes. She saw two black men and three white men standing in the street next to two automobiles. One of the white men was wearing a T-shirt, and Hartman later identified him as the defendant. One of the other white men (Kemmitt) was wearing a leather coat. One of the black men, whom Hartman later identified as Hughes, used a cane.

The defendant was arguing with Hughes about drugs. Hartman testified that she saw the defendant punch Hughes two or three times. Hughes stepped back, turned, and walked up the street, turning back periodically to yell at the defendant, who continued yelling at him.

The other black man, whom Hartman later identified as Donald Harding, then threw beer bottles at the defendant. According to Hartman it was at this point, after he had punched Hughes, that the defendant walked over to the driver's side of one of the automobiles and took something shiny out from under the seat. Kemmitt kept saying, "Don't do it." The group moved around the corner and Hartman lost sight of them. Later, she heard more screaming and saw the defendant, Kemmitt, and Harding pushing and shoving each other. She saw Harding lunge at the defendant and Kemmitt while holding something shiny in his hand.

Another witness, Gerald Hunt, testified that as he walked down LaGrange Street that night, Hughes, whom he knew, approached him, showed Hunt he was bleeding, said he had been stabbed, and said, "The guys down the street are crazy." Walking further down the street, Hunt saw a white man in a white T-shirt, a white man in a leather coat, and a black man. He heard the man in the white T-shirt say, "I didn't come down here for all this bullshit. I just came down here to do what I had to do and leave." Later, he saw these three men running, and noticed the man in the leather coat was bleeding. A little later, he saw the man in the white T-shirt again, lying on the ground after being apprehended by the police. At the defendant's probable cause hearing, Hunt was unable to identify the defendant as the man in the white T-shirt. In 1984, Hunt had been convicted of possession of cocaine with intent to distribute.

In the middle of the trial, the police located two more witnesses, Keith Hicks and Warren Hawkins. They had been unable to locate Hicks earlier because on the night of the crime he had given his name as Keith Bryan. At the time of the incident Hicks was on parole for robbery, and he did not want to get involved. The police were looking for him because he had not reported to his parole officer as required; also, as a condition of parole he was not to associate with known criminals. Hicks was also known as James Bryan. He had been convicted in 1975 of armed robbery, in 1983 of possession of a firearm, and in 1984 of robbery. Hicks agreed to testify at trial after a policeman found him in the "combat zone," grabbed his arm and put him up against the wall, and told him to come to the courthouse to talk to a detective. He was still on parole at the time he testified.

Although his version of events corroborated Hartman's in some respects, Hicks offered significant new testimony. He testified that on the night of May 19, 1987, he was standing on Washington Street with Hughes and Hawkins. He drank some beers and may have smoked marihuana that night. Two white men, one wearing a white T-shirt and the other wearing a leather coat, approached Hicks and Hughes. Hicks

later identified the man in the white T-shirt as the defendant. Hughes and the defendant then argued over the price of cocaine that the defendant wished to buy.

The two white men went into a bar and, when they came out, the defendant and Hughes started arguing again. A short Jamaican man and two other black men were also in the area. The defendant walked over to an automobile parked nearby, grabbed something and walked back to Hughes. Hicks looked away, and when he next looked at the defendant, he saw what looked "like a buck knife with blood on it" in the defendant's hand. Hughes turned and walked away, and the defendant walked across Washington Street.

The short Jamaican man, known to Hicks as "Rasta,"[1] ran up to the defendant and made a motion as if he had stabbed the defendant. The defendant then walked over to where his friend in the leather coat was fighting with a black man named Horace and joined in the fight. Horace slipped away. By that time everybody was fighting in the street. When the police came, the defendant and his friend ran up the street and were chased by the police.

Hicks testified that Donald Harding was not in the area that night. Harding was a closer friend of Hicks' than the Jamaican, Rasta. Although Hicks knew Harding had been arrested for the stabbing of the defendant, he never told the police that Harding was the wrong man. When his friend Hawkins was arrested, he also did not tell police that Hawkins had done nothing.

Warren Hawkins, who had been a friend of Hicks for ten years, came forward to testify at Hicks' request. In 1977, Hawkins had been convicted of armed robbery. For activities in March, 1987, he was convicted of illegal possession of marihuana and receiving stolen property. In February, 1988, he was convicted of illegal possession of cocaine and marihuana. In March, 1988, he was convicted of receiving a stolen automobile. Hawkins was on probation at the time of the incident and at the time he testified.

---

[1] "Rasta" was the street name of Reginald Claxton.

Hawkins testified to essentially the same sequence of events as Hicks had described, except that he did not see anything in the defendant's hands. He saw the defendant and Hughes pushing and shoving one another, and then saw Hughes walk away and the defendant walk in the other direction. He did not see Donald Harding in the area that night. Hawkins testified that he was not involved in any of the fighting that night. He was arrested and charged with attempted murder of the defendant and Kemmitt, but the charges were subsequently dismissed.

One witness, a criminalist for the Boston police department, was presented for the defense. He testified that the victim, Hughes, had blood type O-positive. No type O blood was found on the defendant's T-shirt, but type B was found on the T-shirt. There was type O blood on Kemmitt's leather coat which could have been type O-positive. Type O blood was also found on Hawkins' sweatshirt.

I. *The tainted identification of the defendant.* At trial sixteen months after the crime, Gerald Hunt identified the defendant in court as the man he had seen wearing a white T-shirt on the night of the incident. Hunt had not been able to identify or to recognize the defendant at a probable cause hearing three weeks after the crime. On cross-examination of Hunt, it was revealed for the first time that Hunt had seen a photograph of the defendant one or two days before trial, during a meeting with the prosecutor and a police detective. The prosecutor did not dispute that the procedure at this photographic identification was unnecessarily suggestive. Therefore, at defense counsel's request, the trial judge instructed the jury to disregard the in-court identification.[2] Later, the police detective recounted the circumstances of the photographic identification on direct examination. He claimed that Hunt had pointed to the defendant's picture

---

[2]Although he apparently did not object on this basis at trial, the defendant now claims that, because this limiting instruction was not given until a week after Hunt's testimony, it would not have cured any prejudice caused the defendant by the in-court identification.

and said, "That's the guy that was down there *that did it*" (emphasis added).

Defense counsel objected, fairly raising the point that, if the in-court identification was tainted, the suggestive out-of-court identification must also be bad. Although counsel did not specifically object or move to strike on the ground of hearsay, the judge should have nevertheless excluded the testimony on the basis of the objection. The improper testimony prejudiced the defendant's case.

The detective's testimony was the *only* evidence clearly identifying the defendant as the one "that did it." No one claimed to have seen the defendant stab Hughes. In view of the various inconsistencies among the other witnesses and the dearth of direct evidence linking the defendant to the crime, this testimony could have been the crucial element in the jury's determination of guilt.

II. *Evidence of prior convictions.* The Commonwealth's case hinged on the testimony of four witnesses, who offered conflicting versions of the incident. The credibility of all four was a major issue raised by the defense. Three of the four had prior convictions which were admissible on the issue of their credibility. In particular, the motivation and truthfulness of the only witness who saw a knife in the defendant's hand was questioned by the defense based on his prior convictions.

In her final charge, the judge instructed the jury as follows:

> "Now, you have heard during the course of this trial that certain witnesses have previously been convicted of a crime, and I gave you an instruction before, and I'll give it to you again. Because an individual is a witness before you and is asked whether or not on a prior occasion he committed a crime and served some time in jail or is on parole, *it doesn't mean that you use that and decide that you don't believe that witness* [emphasis added]. You use it in a certain way, and I'm going to tell you how the law says you ought to use it.

.

"The evidence is before you on the issue of whether or not you find it impeaches the witness' credibility as to his present testimony here in this courtroom. So you may consider the evidence of prior convictions of any witness only on the issue of whether or not you believe or find it impeaches the believability or credibility of the witness' present testimony here in this courtroom."

At the end of the charge and before the jury retired, defense counsel objected specifically to the language at the beginning of the final charge on use of prior convictions.

The judge's instruction that prior convictions of a witness are not used by the jury to "decide that you don't believe that witness" was at best confusing and was likely to have misled the jury. Conviction of a crime may be shown to affect the credibility of a witness. G. L. c. 233, § 21 (1990 ed.). See *Commonwealth* v. *Bohannon*, 376 Mass. 90, 93 (1978), S.C., 385 Mass. 733 (1982); *Commonwealth* v. *Leno*, 374 Mass. 716, 717 (1978). The second part of the instruction was correct. The jury were, however, left with a contradictory statement, which seemed to distinguish the use of prior convictions described correctly in the second part of the charge, from the use "to decide that you don't believe that witness" which she told the jury was improper in the first part of the charge. "[W]e cannot know whether the jury were guided by the correct or the incorrect portion of the instructions." *Commonwealth* v. *Richards*, 384 Mass. 396, 403-404 (1981), quoting *United States* v. *Green*, 405 F.2d 1368, 1370 (D.C. Cir. 1968), aff'd, 424 F.2d 912 (D.C. Cir. 1970), cert. denied, 400 U.S. 997 (1971). The jury were entitled to consider the prior convictions in determining how much of the testimony of these witnesses they believed. Because the jury may have thought it was improper for them to do so, we think the erroneous instruction was prejudicial.

For the reasons stated we reverse the judgment and re-mand for a new trial.[3]

*So ordered.*

---

[3]We address one further issue which may arise at a new trial. One wit-ness was released from custody during the course of the trial. The fact that he may have been released from jail as a result of information received from other Commonwealth witnesses is of dubious relevance and should not be raised by the prosecutor. However, if, as happened in the first trial, the defendant thinks that evidence of the circumstances attending the wit-ness's release helps his case under some theory, and raises it again himself, then it may be open to the prosecutor to allude to the entire circumstances thereof, if the trial judge finds the defendant has created an erroneous impression.