COMMONWEALTH *vs.* PAUL SUPPLEE.[1]

No. 95-P-2141.

Suffolk. March 3, 1998. - July 30, 1998.

Present: KASS, JACOBS, & PORADA, JJ.

*Evidence,* Tape recording, Prior conviction. *Witness,* Impeachment, Bias, Cross-examination. *Practice, Criminal,* Severance.

At a criminal trial, the judge's refusal to permit defense counsel to play, for impeachment purposes, an audiotape of a prosecution witness's statement to police did not constitute reversible error, where defense counsel was permitted to use a transcript of the recording to impeach the witness, and where the audiotape, in the circumstances, would likely have strengthened the prosecution's case. [266-268]

At a murder trial, the judge did not abuse his discretion in excluding evidence of a plea and conviction of a third party involved in the crime, offered by the defendant for the purpose of impeaching the accuracy of the testimony of a prosecution witness, where the witness to be impeached by the evidence was no longer on the stand. [268]

At a murder trial, the judge correctly excluded evidence of charges pending in another jurisdiction against a witness called by a codefendant, offered by the defendant to show bias on the part of the witness, where the evidence was, in the circumstances, not probative of that issue. [268-269]

In a criminal case, the trial judge acted within his discretion in denying the defendant's motion for a severance of his trial from that of his codefendants [269], and in limiting defense counsel's cross-examination of a police officer regarding his state of mind during the investigation of the crime [269-270].

INDICTMENT found and returned in the Superior Court Department on July 2, 1992.

The case was tried before *Robert W. Banks,* J.

*Robert S. Sinsheimer* for the defendant.

*Eric Neyman,* Assistant District Attorney, for the Commonwealth.

---

[1] We employ the spelling on the face of the indictment; the defendant spells his name "Suplee" on his pleadings.

KASS, J. In the course of a drunken brawl during the early morning hours of June 13, 1992, Andrew McDonough was bludgeoned and stabbed to death. Eight persons, including the defendant Paul Supplee, were originally charged with the murder.[2] Supplee was indicted for first degree murder and assault with a dangerous weapon. A jury acquitted Supplee of murder but returned a verdict of guilty of assault with a dangerous weapon. From the judgment of conviction on that latter count, Supplee appeals. We affirm.

1. *Exclusion of tape recording of the witness Hession's statement to the police.* As might be supposed, the melee, by definition confused and tumultuous, produced conflicting accounts of what had happened and who was involved with what. One of the most damning witnesses against Supplee was Elaine Hession, a nineteen year old woman who had arrived at the party at 113 L Street, South Boston, shortly before the fatal fight erupted. She was a friend of Supplee's. When first interviewed by police at the scene, Hession pointed out only those whom she had observed as *not* being involved in the attack on McDonough. The next morning, after talking the killing over with her father and her priest, Hession went to the police to give a full account, one that described Supplee as involved in the attack on McDonough, although she expressed uncertainty about whether Supplee had struck McDonough with a golf club. A police detective made an audiotape of that interview. At trial, Hession's testimony no longer expressed uncertainty about Supplee's participation. She described vividly how Supplee had danced like a boxer at and around McDonough, by this time splayed out in a parking lot, and had beaten him with a golf club.

In his cross-examination, counsel for Supplee wished to play the police interview audiotape before the jury for the purpose of impeaching Hession. The trial judge did not permit Supplee's counsel to do so although he was permitted — and did — use a transcript of the interview to impeach Hession. That, Supplee's counsel insisted at trial and now presses on appeal, was not nearly so effective as playing the tape because it failed to catch Hession's tone of tentativeness during the police interview.

No Massachusetts case has yet declared it to be reversible error to refuse playing of an audiotape to a jury, although there is

---

[2]Three of those defendants were tried together with Supplee; three entered pleas of guilty to manslaughter; the eighth was a juvenile, and the proceedings against him were resolved in the Juvenile Court.

a consistent theme in the decisions that to allow the playing of an audiotape is the wiser course, assuming authentication, ready availability of audio equipment in the courtroom, and identification of the salient portions of the tape. See *Commonwealth v. Watson*, 377 Mass. 814, 834-835 (1979), in which the court quoted with approval from *State v. Reyes*, 209 Or. 595, 636 (1957), the following passage:

> "Indeed, a recording has value as evidence which is frequently wanting in a signed confession, for it reproduces the very words . . . in [the witness's] own voice and with all the added meaning and significance that comes from inflection, emphasis, and other attributes of speech."

See particularly *Commonwealth v. Gordon*, 389 Mass. 351, 353-356 (1983), which established guidelines for the use of audiotapes for impeachment. Supplee's offer of the audiotape met all the criteria for playing of a tape set out in *Gordon*. See also *Commonwealth v. Duhamel*, 391 Mass. 841, 844-845 (1984); *Commonwealth v. Carpenter*, 22 Mass. App. Ct. 911, 913 (1986); Liacos, Massachusetts Evidence § 11.13.1 (6th ed. 1994).

There was no sound reason for denying Supplee's request to play before the jury the audiotape of Hession's interview by the police and we think, in the circumstances, the trial judge erred. The error, however, does not require reversal. It will be recalled that the trial judge allowed counsel full scope in impeaching Hession with a transcript of the taped interview. Supplee, therefore, had the full benefit of Hession's words for impeachment purposes. What the tape would have added was tone and inflection. Supplee's counsel made an offer of proof on the point of tone and inflection; the tape was marked for identification; and counsel noted his objection to the judge's refusal (the judge did not listen to the tape) to allow him to play the tape. At the defendant's request, we have listened to the audiotape to consider whether it communicates uncertainty through tone and inflection. Contrary to defense counsel's description, we do not hear an Elaine Hession who is notably tentative in tone or hesitant in manner of speech. The principal characteristic of the audiotape is its poor quality and an intrusive clicking sound in the background. Playing the tape to the jury would have likely reinforced the government's case rather than providing a means

to weaken it, because the jury would have heard Hession's damaging story one more time.

2. *Use of another's conviction to impeach a witness.* Among those involved in the melee was Jason Clifford, who was also well known to Hession. Clifford entered a plea of guilty to manslaughter before the trial of Supplee and his three codefendants. Hession had been on the witness stand for the better part of September 20 and 21, 1993. She testified that she had not seen Clifford striking McDonough, although she observed Clifford holding a golf club. Hession was cross-examined thoroughly about that aspect of her testimony. On October 6, 1993, eight trial days later, Supplee, on his direct case, offered to admit the conviction of Clifford for the purpose of impeaching Hession's testimony. The defense point was that Clifford's plea of guilty meant Hession had been wrong in her observations of Clifford's conduct and, therefore, her observations of Supplee's conduct should be regarded with the greatest skepticism. The judge denied the request to introduce Clifford's conviction and Supplee urges that ruling was erroneous.

General Laws c. 233, § 21, authorizes the use, in limited circumstances, of the prior conviction of a witness of a crime to impeach the credibility of *that* witness. The defense has pointed us to no Massachusetts decision in which the conviction of some other person has been used to impeach the credibility of a nonparty witness. Nor do the Federal cases cited by Supplee, *United States* v. *Campbell*, 848 F.2d 846, 853-854 (8th Cir. 1988) (witness impeached with his own conviction), and *United States* v. *Sanders*, 893 F.2d 133, 136 (7th Cir. 1990), support the defense proposition. We do not discount the possibility that a case might arise in which a judge, within discretion, could permit the use of someone else's conviction in cross-examination to test the accuracy of a witness's perception. This is not such a case since the witness in question, Hession, had long concluded her testimony before the defense tried to bring in Clifford's plea and conviction. The judge acted within his discretion in excluding the Clifford conviction at a time when the witness to be impeached by it was no longer on the stand.

3. *Evidence of pending charges against a witness.* Scott Bresnehan was called as a witness by the codefendant Kevin Dahl. At a certain level, his testimony was damaging to Supplee because it suggested Supplee was not alone outside with one member of the invading group when the fight started. That had

been the defense version. Counsel for Supplee and one of the other codefendants sought to introduce evidence that Bresnehan had criminal charges pending against him in the Brockton District Court to show his bias. *Commonwealth* v. *Henson*, 394 Mass. 584, 586 (1985). The theory of bias in the *Henson* line of cases is that a government witness may be moved to shade testimony to curry favor with the government, from which the witness wants favorable treatment in connection with the pending charges. Here, Bresnehan had not been called by the government; he was a witness for a codefendant and in that context the pending charges were without relevance. Parenthetically, what Bresnehan testified to in a Suffolk County case was not likely to win him points with a Plymouth County prosecutor. The judge rightly excluded evidence of the pending charges.

4. *Severance.* The codefendants did not point fingers at each other. Their defenses were not mutually antagonistic and irreconciable. *Commonwealth* v. *Moran*, 387 Mass. 644, 658-659 (1982). The judge acted within his discretion in denying Supplee's motion for a trial separate from his codefendants. See *Commonwealth* v. *Smith*, 418 Mass. 120, 125-129 (1994); *Commonwealth* v. *Twing*, 39 Mass. App. Ct. 75, 78-79 (1995). Compare *Commonwealth* v. *Moran, supra.*

5. *Cross-examination about police officer's state of mind.* For the purpose of showing that the police structured their investigation to fit a developing theory of what had happened, Supplee's counsel, on cross-examination, asked a Boston police detective: "Well, with respect to your state of mind, with respect to how you are conducting this investigation, your way of thinking, at six-eighteen in the morning . . . ." At that point the prosecutor objected and the objection was sustained, the judge remarking, "This witness's state of mind has nothing to do with this case." "State of mind" may have been a misnomer for what counsel was getting at, and the judge may have taken the term too literally. The question, however, was ill-formed and the judge, in his discretion, could exclude it. Defense counsel was not thwarted from pursuing the general subject of the investigating methods of the police and whether they were leading witnesses to give accounts consistent with the police theory about what had happened. Supplee's counsel must have been convinced that he had developed that theme on cross-examination of various police witnesses, because in closing he waxed emphatic on

the argument that the police had plunged to mistaken conclusions.

*Judgment affirmed.*