# United States Court of Appeals
## For the First Circuit

Nos. 01-1304, 01-1369

JOHNNY STEPHENS,

Petitioner, Appellee/Cross-Appellant,

v.

TIMOTHY HALL,

Respondent, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker, Senior U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

John Salsberg, with whom Michael R. Schneider and Salsberg & Schneider were on brief, for appellant/cross-appellee.

William J. Meade, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief, for appellee/cross-appellant.

June 28, 2002

**LIPEZ, Circuit Judge**. Johnny Stephens was convicted by a Massachusetts jury of unarmed robbery and assault and battery with a dangerous weapon. On appeal, he argued that his right to effective assistance of counsel was violated when his trial counsel neglected to cross-examine the alleged victim as to her prior convictions and pending criminal charges, and that the trial court violated his rights under the Confrontation Clause when it refused to allow counsel to recall the victim for further cross-examination. The Massachusetts Appeals Court rejected both claims and affirmed Stephens's conviction. Commonwealth v. Stephens, 693 N.E.2d 717 (Mass. App. Ct. 1998) (Stephens I). The Supreme Judicial Court denied further review.

Stephens then filed a petition for habeas corpus under 28 U.S.C. § 2254, again alleging violations of his rights to effective assistance of counsel and to confront adverse witnesses. The district court rejected the Confrontation Clause claim, but agreed that Stephens had received ineffective assistance of counsel. Stephens v. Hall, No. Civ. A. 99-12104-MEL, 2001 WL 92269 (D. Mass. Jan. 24, 2001) (Stephens II). It concluded further that the Appeals Court's decision to the contrary was an unreasonable application of federal law, and ordered a new trial for Stephens. See 28 U.S.C. § 2254(d)(1). The Commonwealth appeals from that judgment. Stephens cross-appeals from the district court's rejection of his claim under the Confrontation Clause. We affirm the latter judgment, but reverse the district court's issuance of the writ on the ineffective assistance of counsel claim.

## I.  BACKGROUND

On October 22, 1992, at approximately 7:30 p.m., Eleanor Washington staggered into a police station in the Roxbury section of Boston bruised and bleeding.  She claimed to have been robbed by two men, one of whom she referred to as "Johnny."  She later told police that her assailants were named Johnny Stephens and Kevin Walker, and identified both men from police photographs.  She also added that Stephens had threatened her with a gun during the robbery.

Stephens and Walker soon were arrested, and charged with armed robbery and assault and battery with a dangerous weapon (namely, their boots).  They were tried together in October, 1993. Washington was the government's star witness, and her testimony was damning.  She described the robbery and assault in detail, explaining how Stephens hit her until she fell to the ground, and then kicked her repeatedly.  Washington identified Stephens and Walker in the courtroom, stating that she had "no doubt" that they were the men who attacked her.

On cross-examination, Stephens's counsel attempted to impeach Washington's credibility by pointing out inconsistencies between her trial testimony and the statements she made to the police immediately after the assault.  That strategy was frustrated, however, by Washington's insistence that she lost

consciousness during the beating, and could not remember anything prior to waking up in the hospital.[1]

Defense counsel also had prepared a second avenue of attack. Washington had several prior convictions: a 1992 conviction for possession of cocaine and two 1987 convictions for uttering a forged instrument and receiving stolen property. In addition, at the time of the alleged robbery, charges were pending against her in a different county for possession of a hypodermic needle and possession of a firearm. Both cases were adjudicated early in 1993, less than a month after Washington's grand jury testimony in the case against Stephens. She was convicted of the charges for possession of a hypodermic needle, but acquitted on the firearms charge.

According to his notes made in anticipation of trial,[2] Stephens's attorney planned to question Washington extensively about her criminal history. His questions were designed to suggest that Washington had been treated leniently on the pending charges as a result of her allegations, and grand jury testimony, against Stephens. More generally, counsel hoped to show that Washington was savvy about the criminal justice system and therefore would

_____

[1] As counsel acknowledged at side bar, Washington was an effective witness on cross-examination:
    THE COURT: This lady is a lot better witness than many of my plaintiffs. This lady picks up a little steam on cross-examination.
        Mr. OSLER [Stephens's counsel]: Yeah. Don't rub it in.

[2] Stephens's attorney submitted copies of those notes to substantiate Stephens's claim that his failure to cross-examine Washington about her criminal history was a mistake rather than part of counsel's trial strategy.

have had no trouble fabricating or embellishing charges.  Finally, Washington's prior convictions could have been used to assail her credibility as a witness.

Stephens's counsel never pursued that line of questioning, however, because he forgot to bring his notes regarding Washington's criminal history to the podium when he began cross-examination.  Thus, when he reviewed his notes at the end of questioning, he believed (mistakenly) that he had not omitted anything.  That evening, he remembered that he had meant to question Washington as to her prior convictions and pending charges.

On the next day of trial, Stephens's counsel sought permission to recall Washington so that he could reopen his cross-examination.  The court, distrustful of counsel's claim that the omission was a simple mistake rather than a strategic ploy, denied the request.[3]  Nevertheless, the judge indicated that he would permit Stephens to call Washington as his own witness.  If Stephens had done so, he arguably could have questioned Washington on pro-prosecution bias and thus gotten into evidence the pending charges on the theory that Washington wished to curry favor with the government.  It is unlikely that he could have gotten into evidence the prior convictions, as one may not impeach one's own witness

---

[3] The court also expressed concern that "in any criminal case, if the defendant wishes to get another crack at the victim, another shot at a victim, another chance to cross-examine the victim, they could always file an affidavit and ask that person to be called as the last witness, or whatever it is, under threat that it may be incompetency of counsel.  I think that would be an awful bad precedent to start . . . ."

with such evidence. See Mass. Gen. Laws ch. 233, § 23 (forbidding impeachment of party's own witness with evidence of bad character); Commonwealth v. Arsenault, 280 N.E.2d 129, 137 (Mass. 1972) (noting that prior convictions usually are used to prove bad character).

Defense counsel decided not to recall Washington as a witness in Stephens's case, and the jury never learned of her criminal history. However, counsel was able to impeach her credibility by other means. Through cross-examination of other government witnesses, Stephens's counsel exposed certain inconsistencies in Washington's story of the alleged robbery. For example, the jury learned that Washington had not mentioned a gun when she was interviewed at the police station on the night of the alleged robbery, nor when she first described the incident to the detective assigned to the case. Similarly, government witnesses conceded that Washington originally had indicated that the robbery and beating took place inside the hallway of a building, although she later placed the incident in an outside courtyard. Washington's description of her assailants also took on more detail in the days following the assault.

In his closing argument, Stephens's counsel argued that the inconsistencies in Washington's story were sufficient to create a reasonable doubt as to whether Washington was lying about the defendants' role in the beating, and about the robbery itself. Unpersuaded, the jurors returned a verdict finding both Stephens and Walker guilty of assault with a dangerous weapon. The jury also found both men guilty of unarmed robbery, acquitting them of

the more serious charge of armed robbery.  Stephens was sentenced to a term of 25 to 40 years for the unarmed robbery, and a concurrent term of nine and one-half years to ten years for the assault.

## II.  INEFFECTIVE ASSISTANCE OF COUNSEL

Stephens argues that counsel's failure to cross-examine Washington regarding her prior convictions and pending charges violated his right to effective assistance of counsel.  Under the well-known test set out in Strickland v. Washington, 466 U.S. 668 (1984), he must show, first, that counsel's representation fell below an objective standard of reasonableness, based on prevailing professional norms.  See id. at 688-90.  Second, Stephens must demonstrate that the identified acts or omissions prejudiced his defense.  That is, he must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

Massachusetts courts observe a similar standard when assessing claims under the state constitution.  Specifically, the defendant must show that his attorney's conduct fell "measurably below that which might be expected from an ordinary, fallible lawyer," and that, as a result of counsel's errors, he was "likely deprived . . . of an otherwise available, substantial ground of defen[s]e."  Commonwealth v. Saferian, 315 N.E.2d 878, 883 (Mass. 1974).  We have concluded elsewhere that "[t]he standard for

ineffective assistance under Massachusetts law appears functionally equivalent to the federal standard." Phoenix v. Matesanz, 189 F.3d 20, 27 n.4 (1st Cir. 1999); accord Ouber v. Guarino, No. 01-2390, 2002 WL 1290413, at *13 (1st Cir. June 17, 2002) (observing that, "for habeas purposes, Saferian is the functional equivalent of Strickland"). Accordingly, in discussing Stephens's claim, we do not differentiate between the two standards.

## A.   The State Court's Decision

The Massachusetts Appeals Court affirmed Stephens's conviction on direct review, rejecting his claim of ineffective assistance of counsel. The court assumed, without deciding, that counsel's failure to cross-examine Washington as to her criminal history was objectively unreasonable under the "performance" prong of the test for ineffective assistance. Stephens I, 693 N.E.2d at 720. It concluded, however, that Stephens had "failed to demonstrate that better work would have made a difference in the jury's decision." Id. (citing Commonwealth v. Satterfield, 364 N.E.2d 1260, 1264 (Mass. 1977)). The court reasoned as follows:

> The failure to impeach a witness does not generally prejudice the defendant to such a degree as to constitute ineffective assistance of counsel. Moreover, here, Washington was thoroughly cross-examined using her prior inconsistent statements, and she admitted having consumed alcohol on the night of the alleged attack. Notwithstanding counsel's failure to use Washington's criminal history to cast doubt upon her credibility, his cross-examination was apparently quite effective, as evidenced by the jury's decision to acquit both defendants of armed robbery, in spite of Washington's claim that a gun was used in the attack.

-8-

Id. (internal quotation marks, citations, and alterations omitted).

With respect to counsel's failure to recall Washington as a witness in Stephens's case, the court observed that "there is nothing in the record to indicate that Washington had entered into an agreement with the prosecutor, or had been promised leniency in exchange for her testimony." Id. Consequently, the court concluded that counsel's decision to forego the opportunity to question Washington about the charges pending against her at the time of the incident was not "manifestly unreasonable," and therefore did not support a finding of ineffectiveness. Id. (internal quotation marks omitted). The Supreme Judicial Court rejected Stephens's application for leave to obtain further appellate review.

## B. The District Court's Decision

Stephens then filed the instant petition in the district court, seeking federal habeas corpus relief under 28 U.S.C. § 2254. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the district court could grant habeas relief only if it concluded that the Massachusetts Appeals Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court elaborated on AEDPA's standards of review in Williams v. Taylor, explaining that:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that

reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. 362, 412-13 (2000); accord Bell v. Cone, 122 S. Ct. 1843, 1850 (2002).

Stephens argued that the Appeals Court "unreasonabl[y] appli[ed]" the federal standard for ineffective assistance in rejecting his claim. The district court agreed. It determined, first, that Stephens had satisfied the performance prong of the Strickland test: "Stephens' trial counsel's failure to cross-examine Washington regarding her prior criminal record and a pending charge, although induced involuntarily by a regrettable lapse of memory, caused his representation to fall below the 'objective standard of reasonableness' based on 'prevailing professional norms.'" Stephens II, 2001 WL 92269, at *3 (quoting Strickland, 466 U.S. at 688) (footnote omitted)).[4]

The court then turned to the prejudice inquiry, noting that "the operative question [under the prejudice prong] is

---

[4] The court made clear that its conclusion was based only on counsel's initial failure to cross-examine Washington as to her prior convictions and pending charges. It rejected the state's attempt to "deflect the focus from Stephens' counsel's initial inexplicable mistake . . . to his decision not [to] re-call Washington," reasoning that "[c]ounsel's extremely questionable decision not to re-call Washington has no bearing on whether his initial blunder of forgetting to adequately cross-examine Washington rendered his assistance defective." Stephens II, 2001 WL 92269, at *3 n.1.

-10-

whether, if Stephens' counsel had presented the jury with evidence of Washington's four prior convictions and [pending charges], there would have been a reasonable probability that the jury would have found a reasonable doubt that Stephens' [sic] was guilty." Id. at *4. In addressing that question, the court emphasized the importance of Washington's testimony: "If the jury did not believe Washington, the prosecution had no case." Id. It pointed out that the jurors would have had cause to doubt Washington's testimony even without knowledge of her criminal history, given the inconsistencies in her story. Indeed, the jurors apparently did doubt Washington's veracity, as demonstrated by their conclusion that Stephens had not brandished a gun during the robbery as Washington claimed. Finally, the court observed that Washington's criminal history -- which included two crimes (uttering a forged instrument and accepting stolen goods) involving dishonesty -- "went to the heart of her credibility." Id. Based on those factors, the court concluded that it was "likely" that the jury would not have voted to convict Stephens if it had been informed of Washington's "criminally dishonest past." Id.

The next question, therefore, was whether the Appeals Court's contrary conclusion represented an "unreasonable application" of federal law, so as to warrant relief under AEDPA, 28 U.S.C. § 2254(d)(1). The district court acknowledged that AEDPA "dramatically narrowed the class of petitions in which a state prisoner is entitled to Federal habeas relief." Id. at 6. Nevertheless, it concluded that Stephens's was one of the "minute

-11-

number of habeas petitions" that still were entitled to relief under the restrictive standards set out in AEDPA.  Id.

In the district court's view, the Massachusetts Appeals Court's finding that Stephens was not prejudiced by his counsel's errors was "unrealistic and implausible."  Id.  The Appeals Court -- like the district court -- had placed emphasis on the jury's acquittal of Stephens on the charge of armed robbery, apparently because it did not credit Washington's testimony that Stephens held a gun to her head during the robbery.  However, while the district court believed that factor strongly supported Stephens's claim, the state court drew a different conclusion, reasoning that if the jury partially disbelieved Washington even without knowledge of her criminal history, it was unlikely that additional impeachment evidence would have made a difference.  The district found such logic "not supportable":  "The jury's half-hearted belief only makes it more (not less) likely that if they were to have been apprized of her record of criminal dishonesty [and the charges pending against her] the disclosure would have [led] to their total disbelief of her story."  Id. at 5.  The court concluded that the Appeals Court's explanation for its decision was "simply unpersuasive in light of the counter argument that if the jury only half-believed Washington without hearing of her record or the pending charge[s] there was more than a reasonable probability that they would not have believed her at all, if they had known about her criminal record and the pending charge[s]."  Id. at 6.  Thus, the court granted Stephens's § 2254 petition on the ground that his

"conviction was secured through the denial of his Sixth Amendment right to effective assistance of counsel."  Id. at 7.

## C. Analysis

The Commonwealth appeals, arguing that the district court improperly substituted its judgment for that of the Massachusetts Appeals Court.  We review the district court's decision de novo. Simpson v. Matesanz, 175 F.3d 200, 205 (1st Cir. 1999).  Thus, like the district court, we must determine whether the state court's decision was contrary to, or represented an unreasonable application of, federal law.

Stephens concedes that the Appeals Court applied the correct standard to his claim of ineffective assistance.  The key question, therefore, is whether the state court unreasonably applied that standard in rejecting Stephens's claim.  The Appeals Court assumed, without deciding, that counsel committed serious error when he forgot to cross-examine Washington about her criminal history.  It did not indulge the same assumption with respect to counsel's decision not to recall Washington as part of Stephens's case, concluding that this decision was not unreasonable.  Thus, under the Appeals Court's approach, the only possible prejudice arose from the failure to examine as to the prior convictions; no prejudice could arise from the failure to call Washington and question her about a pro-prosecution bias arising from her pending charges.  Nevertheless, we will, in Stephens's favor, include both

categories of evidence in the prejudice analysis.[5]  Rather than assessing the reasonableness of counsel's performance, we assume that counsel erred both in neglecting to cross-examine Washington originally, and in deciding not to recall her as a witness for Stephens.  See Strickland, 466 U.S. at 697 (stating that reviewing courts may forego inquiry into counsel's performance and focus solely on the second prong of the test "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice").  Accordingly, we turn directly to the question that divided the district court and the Massachusetts Appeals Court:  whether there was a "reasonable probability" that the outcome of the trial would have been different if the jury had known about Washington's criminal history.  Id. at 694.

In weighing the prejudicial effect of counsel's errors, we must consider the totality of the evidence before the judge or jury.  "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  Id. at 696.  Where, as here, the relevant error is the failure to impeach a government witness, we begin by assessing the strength of the prosecution's case and the

_____

[5] We note that the district court seems to have considered the impeachment value of the pending charges (which could have been used on direct examination if Stephens chose to call Washington as part of his own case) as a factor in its prejudice analysis. However, the court never determined whether counsel's decision not to recall Washington was objectively unreasonable under the performance prong of the Strickland test.  If, as the Appeals Court concluded, counsel acted reasonably in deciding not to call Washington as a witness, then the fact that the jury never learned of the pending charges should not have entered into the prejudice analysis.

effectiveness of the defense absent the impeachment evidence.  We then consider "the potential impeachment value of [that evidence] in undermining the credibility of the government witness['s] testimony."  Gonzalez-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001).

### 1.  The prosecution and defense cases

In assessing the evidence presented at trial, we describe in detail the testimony of the various witnesses and the arguments advanced by the lawyers for each side.  Such careful analysis is necessary in cases such as this, where we must make a difficult judgment about the potential impact on jurors of evidence not presented to them.

### a.  The prosecution's case

Washington's credibility was central both to the government's case and to Stephens's defense.  Stephens did not dispute that Washington had been assaulted on the night in question.  Rather, his defense hinged on the notion that she had not been robbed -- at least not by Stephens and Walker -- but had invented the robbery and named Stephens and Walker as the perpetrators in order to please the police or to deflect attention from the real cause of her injuries.[6]  In his opening statement, defense counsel urged the jury to "pay very, very careful attention, because the government's case against my client . . . is

---

[6] Apparently, Stephens hoped to suggest that Washington incurred her injuries during a fight with her boyfriend.

-15-

based entirely on the words of Eleanor Washington. Words and stories."

### i. Eleanor Washington

The prosecution's first witness was Washington herself. She testified that, at approximately 6:30 p.m. on October 22, 1992, she was on her way to visit a friend who lived in the Orchard Park housing development in Roxbury. She was walking down a path through the middle of the development and was about to "cut through [a] building to get to one side" when she was approached by two men whom she knew from the neighborhood as "Johnny" and "Kevin." Walker asked her "What's up? What's up?" He then snatched at her pocketbook several times. When Washington tried to pull her pocketbook away, Stephens demanded that she turn over her money. She gave him $42 in cash, but Stephens, apparently, believed that she had more. He pulled out a silver gun and, holding it to Washington's forehead, asked her repeatedly whether she had any more money. She did not. Washington showed him that her pockets were empty and dumped out her purse. Stephens then started hitting her with his hands.[7] At one point, Washington tried to break away, but Walker was blocking her path. Eventually, she fell to the ground, and Stephens -- who was wearing heavy yellow work boots -- began to kick her in the face, head, and back. She was not sure whether Walker kicked her as well. Eventually, she passed out.

---

[7] Washington testified that she did not know what he had done with the gun.

Washington testified that she did not remember going to the police station on the night of the robbery. Instead, the first thing she could remember after losing consciousness was waking up in the hospital, where she stayed that night. The next day, October 23, she spoke on the telephone with Detective Paul Martin of the Boston Police Department. She told him that she had been attacked and robbed by Johnny Stephens and Kevin Walker, and described both men. On October 24, Detective Martin came to her home with a book of photographs. She identified both Stephens and Walker. Washington also described to Detective Martin the handgun that Stephens had used during the robbery.[8]

Washington was cross-examined extensively by Stevens's counsel, but without much success. Washington denied having told Detective Martin that the robbery and beating occurred inside a hallway, explaining that she told him that she was cutting "through a building," but that "it didn't happen inside a building." She also denied telling the detective that two people had participated in the beating. Washington reiterated that she did not know how many people hit and kicked her once she fell to the ground: "I was down on the ground trying to save my face and everything else that I was blocking."

Defense counsel then turned to Washington's statements at the police station immediately after the incident, before she was taken to the hospital. Although Washington told Detective Martin

---

[8] Detective Martin took several pictures of Washington that day, and those photographs were introduced into evidence to show Washington's injuries.

that she knew both Walker and Stephens by their first names, she gave only the name "Johnny" at the police station. Defense counsel pressed her on that point, but to no avail. "Like I said," she responded, "I don't remember how I got to the police station. I don't remember what I said to anybody at the police station. I don't even know how I got to the hospital, so therefore I can't tell you what I said when I got in the police station . . . ." In response to further questioning, Washington explained that she knew Walker and Stephens by their first names, and had learned their last names by "ask[ing] around." She refused to divulge the names of the people to whom she had spoken.

Eventually, defense counsel returned to the subject of Washington's recollections of the police station and the hospital. She repeated that she had no memory of anything before waking up in the hospital -- and so did not recall talking to EMTs at the police station, or to a nurse at the hospital. She did remember, however, that one of her assailants had put a gun to her head. When defense counsel tried to exploit her selective memory, she explained that she remembered the gun "[b]ecause I was alert then. I wasn't beat. I wasn't stomped. I wasn't kicked in my head. I was looking, standing dead at them." However, due to her subsequent loss of consciousness, Washington continued, she did not remember whether she had told anyone at the police station or the hospital about the gun. Defense counsel suggested that her loss of consciousness might have been caused by alcohol, but Washington denied drinking that night. "If I had anything, I might have had a wine cooler.

-18-

I don't have -- because I don't drink alcohol, okay? A wine cooler."

Counsel for co-defendant Walker cross-examined Washington as well. Rather than attempt to impeach her testimony, he sought to make clear that Walker never took any of Washington's money, and that he never punched her. Washington conceded both points, but would not confirm that Walker did not kick her when she was on the ground, saying "I do believe he was involved in what was going on with me."

### ii. Officer Evelyn Davis

The prosecution then called its next witness, Officer Evelyn Davis, who had been staffing the front desk of the Roxbury police station on the evening of October 22. Officer Davis testified that she saw Washington stagger into the station at approximately 7:30 that evening. Washington was holding her face, which was covered in blood. Officer Davis helped Washington sit down on a bench, and cleaned off her face with paper towels. She then called the EMTs and, while waiting for them to arrive, asked Washington several questions about the incident. Officer Davis explained that Washington told her that she had been robbed in the Orchard Park projects. She described one of her assailants, whom she identified as "Johnny." After consulting her report from that evening, Officer Davis added that Washington had described "Johnny" as a black male, approximately 40 years old. She could not describe what he was wearing. Officer Davis stressed that her

primary concern at that point was Washington's well-being, and that the interview was not intended to be "thorough or complete."

On cross-examination by Stephens's counsel, Officer Davis confirmed that Washington was conscious when she entered the police station, and that she apparently had walked there herself. Indeed, she was lucid enough to give her address, phone number, and date of birth. Officer Davis also confirmed that Washington had stated that the robbery took place in a hallway inside one of the buildings in the housing development. Moreover, although Officer Davis asked her whether any kind of weapon was used, Washington did not mention a gun. Instead, she indicated that the robbery and assault had been accomplished with "feet and hands." Finally, Officer Davis testified that Washington gave only a partial description of Stephens, and could not describe -- and did not name -- Walker at all.

Walker's counsel cross-examined Officer Davis briefly, asking her only whether her report mentioned Walker by name. Officer Davis stated again that Washington "did not mention a second name."

### iii. Joseph O'Hare

On the next day of trial, the prosecution called Joseph O'Hare, one of the EMTs who treated Washington at the police station and transported her to the hospital on October 22. O'Hare testified that Washington's injuries were consistent with "trauma to the face from an outside force," "some type of blow or trauma to her face," but not with falling down. His report from that evening

-20-

confirmed that Washington had a normal "level of consciousness" and was "up walking around." Although O'Hare had noticed an odor of alcohol on her breath (and noted it in his report), he explained that she "did not appear impaired."

On cross-examination, Stephens's attorney asked several questions designed to emphasize that Washington appeared to be "conscious and alert" in the police station. O'Hare stated that he had asked her whether she might have lost consciousness during the beating, and that Washington "denied that she had any loss of consciousness."

### iv. Detective Paul Martin

The prosecution's final witness was Detective Paul Martin. The prosecutor led him through his telephone conversation with Washington on October 23 and his meeting with her on October 24. Over defense counsel's objections, Detective Martin recounted the story of the robbery and assault as told to him by Washington on October 23. The story was, for the most part, consistent with Washington's testimony at trial, including the fact that Washington could not remember going to the police station.

Detective Martin testified that Washington had given him the first names and descriptions of both her assailants on October 23. She explained to him that she knew both men from the neighborhood, but did not know their last names. However, she knew some people in the Orchard Park development who she thought could give her the full names of the two men. Detective Martin called Washington again the next day, October 24, and at that point she

was able to give him the last names of Walker and Stephens.  Later that day, Detective Martin brought a book of photographs to Washington's house, and she positively identified both men.

On cross-examination, Stephens's counsel drew out several inconsistencies in Washington's story.  First, Detective Martin confirmed that Washington initially told him that the incident took place "[i]n the hallway . . . in one of the apartment buildings." Washington, he explained, had said she was on the first floor of the building, "cutting through from one door to go out the other door on the other side of the building."  She did not know which building it was, and Detective Martin conceded that he never went to the site with her to try to identify the building.  Second, Detective Martin's notes from his first conversation with Washington indicated that she had reported that both of her assailants had beaten and kicked her, whereas she testified at trial that Walker had not hit her, and that she could not recall whether Walker had kicked her once she fell to the ground. Detective Martin also stated that Washington's descriptions of the two men were significantly more detailed on October 23 than they had been in the police station the previous day, directly after the incident.  Finally, he confirmed that Washington did not mention a gun when she first described the incident to him on October 23.

### b.  Stephens's case

At the close of the prosecution's case, Stephens called his first and only witness:  private investigator Gerard Belleveau. Belleveau testified that he had spoken to Washington roughly eight

months after the incident, and that she told him that she did not know either Stephens's or Walker's names previously, but had "learned [the name Johnny] during the incident."

### c. Walker's case

Stephens rested his case at the close of Belleveau's testimony, and Walker called his only witness, attorney John Conwell. Conwell had represented Walker earlier in the case, and testified that he spoke to Washington on three occasions. On the first occasion, he stated that he approached Washington in the courtroom of the Roxbury District Court, and asked her, "'What did Kevin do to you?'" Washington replied, "'He didn't help me. He was there and he didn't help me.'" Conwell saw Washington again before a hearing in the case, and asked her what she planned to say at the hearing. "[S]he said she was going to testify that Kevin did nothing, that he didn't do anything." The last time Conwell saw Washington, she had arrived at the courthouse late, missing a hearing that had already been rescheduled due to several continuances. In Washington's absence, the Roxbury district court had dismissed the charges against Walker for want of prosecution. (Washington later testified before the grand jury and the charges were reinstated.) Conwell remembered speaking to Washington at approximately 3:30 that afternoon. She inquired after Walker, and Conwell told her that he was going to be released. Washington replied, "'[t]hat's good because he didn't do anything anyway.'" Conwell then arranged with Washington to meet Walker at a nearby deli as soon as he was released. When Walker arrived at the deli,

he and Washington embraced and then "walk[ed] down Warren [Street] towards the Orchard Park Project with their arms around each other." In response to a question from Stephens's counsel, Conwell added that he said to Washington and Walker, "'You're going down to Zeigler Street to get high'" and that "[t]hey both turned around and laughed and nodded and said, 'Yes.'"

### d. Rebuttal

The prosecutor then called a rebuttal witness, Assistant District Attorney Sean Donahue. Donahue was handling Walker's case on the day it was dismissed, and had called Washington to ask her to come to court to testify. Washington did not show up, and the district court judge dismissed the case at approximately 3:10 p.m. Washington arrived soon thereafter, explaining that she was late because she had walked to the courthouse from Brookline. Donahue asked the judge to vacate the dismissal, but the judge denied the request and told him that the case could be presented to the grand jury. Donahue had other hearings that day, so he asked Washington to sit down and wait for him so that they could discuss what to do about the case. Once his other matters were finished, he spoke with Washington in the office of the Roxbury Court. Washington was annoyed at having walked all the way to the courthouse only to find that the case had been dismissed, so Donahue arranged for a police officer to drive her home. Washington left the office at approximately 4:00 p.m.

Stephens's counsel cross-examined Donahue, attempting to show that he had confused Walker's case with Stephens's, and that

the events he described took place in connection with Stephens's case, and did not contradict Conwell's testimony. That attempt was largely unsuccessful, as Donahue testified that he had a record of the events in Walker's file, referencing the date on which Walker's case was dismissed.

### e.  Summary

At the close of evidence, therefore, the government had shown, without contradiction from the defendants, that Washington had been badly beaten on the night in question. Washington had testified unequivocally that Stephens and Walker were responsible for the beating, and that Stephens had taken her money while Walker stood by. Officer Davis and Detective Martin confirmed that the essence of Washington's story -- that she was assaulted and robbed by a man she knew as Johnny -- remained consistent from the outset.

Nevertheless, the defendants managed to expose certain inconsistencies in the details of Washington's story. Stephens's counsel emphasized those inconsistencies in his closing argument, pulling together the various threads of testimony that called into question the accuracy of Washington's account. He pointed out that Washington initially told Officer Davis and Detective Martin that the robbery took place in the hallway of one of the buildings in the housing development. At trial, however, she stated explicitly that the incident occurred outside, in a courtyard. Defense counsel argued that the difference between those two accounts was not merely a matter of recollection; rather, Washington had provided specific details to support each version. For example,

Washington told Detective Martin that Walker had stood in her way so that she could not get out of the hallway.  And at trial, she testified that during the assault someone shouted out of a window to "take this shit away from the window."  Defense counsel argued that such evocative details suggested fabrication, not a memory lapse or simple confusion.

As both the district court and the Massachusetts Appeals Court observed, defense counsel's efforts to discredit Washington were at least partially successful.  The jurors apparently concluded that at least some of Washington's testimony was not to be believed, and refused to convict Stephens of armed robbery.  We turn, therefore, to the "potential impeachment value" of the missing evidence of her criminal history.  Gonzalez-Soberal, 244 F.3d at 278.  Before we determine whether the state court's conclusion was unreasonable, we assess whether there is a "reasonable probability" that the missing impeachment evidence would have so undermined Washington's credibility as to call into question the rest of her story.  Strickland, 466 U.S. at 694.

## 2.  **The impeachment evidence**

In assessing the impeachment value of the evidence of Washington's prior convictions and pending charges, we are guided by the Supreme Court's decision in Davis v. Alaska, in which the Court discussed the nature of such evidence:

> One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness.  By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is

-26-

> such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing biases, prejudices, or ulterior motives of the witness as they may relate directly to the issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony.

415 U.S. 308, 316 (1974) (internal quotation marks omitted).

Here, the bulk of the relevant evidence related to prior convictions, and therefore would have served as a "general attack" on Washington's credibility. Id. Under Massachusetts law, as elsewhere, Stephens's counsel would have been permitted to introduce the fact of the prior convictions -- including the date and the crime charged -- but could not question Washington as to their details. Thus, the jury would have learned that, in the past five years, Washington had been convicted of possession of drugs and related paraphernalia (cocaine and a hypodermic needle), and that she had "utter[ed] a forged instrument" and accepted stolen property. The judge would have instructed the jurors that they could not rely on those convictions as proof that Washington was a person of bad character; that is, someone who was prone to abuse drugs, or to steal, for example. Rather, the jurors could consider evidence of prior convictions only to determine whether or not they called into question Washington's credibility as a witness. Commonwealth v. Roberts, 389 N.E.2d 989, 996-97 (Mass. 1979); see

also Commonwealth v. Riccard, 575 N.E.2d 57, 60-61 (Mass. 1991) (approving of the portion of trial court's jury instructions that stated that jury could "consider the evidence of prior convictions of [government witnesses] only on the issue of whether or not you believe or find it impeaches the believability or credibility of the witness' present testimony here in this courtroom").[9]

Stephens also was prepared to question Washington about charges that were pending against her at the time of the alleged incident on October 22, 1992, and when she testified before the grand jury in March of 1993. As a general rule, pending charges are relevant to show pro-government bias on the part of the testifying witness, on the theory that the witness might tailor her testimony to please the prosecutor, in exchange for a promise of leniency on the pending charges. See Commonwealth v. Henson, 476 N.E.2d 947, 951-52 (Mass. 1985). A colorable showing of bias can be important because, unlike evidence of prior inconsistent statements -- which might indicate that the witness is lying -- evidence of bias suggests why the witness might be lying. See Commonwealth v. Martin, 750 N.E.2d 1009, 1011 (Mass. 2001) (holding that district court erred in barring inquiry into bias because, "[a]lthough arguably defense counsel was able to illustrate some

---

[9] The judge might also have instructed the jurors that convictions "which involved basic honesty, such as perjury or larceny," might affect the witness's credibility more than a crime not involving honesty, such as prostitution. Commonwealth v. Bumpus, 290 N.E.2d 167, 176 (Mass. 1972) (approving such an instruction, provided that the jurors are reminded that they are "the ultimate arbiters of credibility" (internal quotation marks omitted)), vacated on other grounds, 411 U.S. 945 (1973).

-28-

inconsistencies in the complainant's testimony, evidence respecting her motive in accusing the defendant was entirely lacking").

We note, however, that any suggestion of bias would have been rather weak in this case. The charges against Washington were pending in a different county, under the authority of a different prosecutor. What Washington alleged or testified to in Stephens's case was "not likely to win [her] points" with a prosecutor from a different county. Commonwealth v. Supplee, 697 N.E.2d 547, 550 (Mass. App. Ct. 1998); see also Henson, 476 N.E.2d at 951-52 (stating rule that "charges pending in the same county normally may be inquired into if the ground of bias is specifically asserted" (emphasis added)). Defense counsel's notes suggest that he planned to argue that the charges pending against Washington might have encouraged her to stick to her original story to avoid the wrath of a prosecutor who likely could make trouble for her. Perhaps so, but that possibility does not explain why the existence of those charges would have prompted her to invent the story in the first place. Washington did not need to fabricate a robbery or name the wrong perpetrators in order to engage the sympathy of the prosecutor who was handling the charges against her: she already was a sympathetic figure because of the brutal attack that indisputably occurred.

In sum, it is debatable whether Stephens's counsel would have been able to parlay the pending charges into a strong showing of bias. Nevertheless, the existence of such charges had some value as impeachment evidence. And, as noted, defense counsel

could have used Washington's prior convictions to argue to the jury that Washington was "less likely than the average trustworthy citizen to be truthful in [her] testimony." Davis, 415 U.S. at 316. Although such a general attack on her veracity may not have been enough to persuade the jury that Washington had fabricated the charges against Stephens and Walker, it bears emphasis that Washington's credibility was critical to the prosecution's case. We noted in Gonzalez-Soberal that "a significant factor weighing in favor of finding prejudice is the absence of any corroborating evidence other than the testimony of" the witness whom defense counsel failed to impeach. 244 F.3d at 278. Such is the case here. Washington was the only witness who could place Stephens at the scene of the attack, and who could testify that the crime involved a robbery (whether armed or not). Moreover, as in Gonzalez-Soberal, there were "several weaknesses" in her testimony, even without the missing impeachment evidence. Id. Together, these factors make the question of prejudice a "close call." Id. at 279.

### 3. **AEDPA applied**

The dispositive question under AEDPA, however, is not whether we believe that Stephens was prejudiced by his counsel's errors. See Bell, 122 S. Ct. at 1852 ("[U]nder § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly."). Rather, we must ask whether it was unreasonable for the Massachusetts Appeals Court to conclude that he had not met

his burden of showing prejudice. In defining an "unreasonable application" of federal law, the Supreme Court has said that "the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law." Williams, 529 U.S. at 410. Thus, under AEDPA, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

On the facts of this case, we conclude that the state court's rejection of Stephens's claim of ineffective assistance of counsel did not represent an unreasonable application of federal law. As noted, both the Appeals Court and the district court found it important that defense counsel was able to call into question Washington's credibility even without the evidence of her criminal history. The district court thought there was a reasonable probability that the jurors' refusal to credit Washington's claim that Stephens had used a gun would have matured into a reasonable doubt as to her entire story if they had known about her prior convictions and pending charges. The Appeals Court thought otherwise, reasoning that the missing impeachment evidence added nothing new. The jurors already suspected that Washington's testimony might not be entirely accurate, yet -- despite those doubts -- they still concluded that she was not lying about the core facts of the assault and robbery.

-31-

Thus, both courts recognized that the prosecution's case depended almost entirely on Washington's credibility, and that Stephens had succeeded in calling into question some of the specifics of Washington's story. They differed only in their assessments of whether and to what degree knowledge of Washington's criminal history would have shaken the jury's belief in the essential elements of her story. We have carefully reviewed the evidence presented at trial, and considered the nature of the missing impeachment evidence. Based on that review, we do not think the evidence regarding Washington's criminal history was so damaging that it was unreasonable for the Appeals Court to conclude that Stephens was not prejudiced by its omission. Under AEDPA, that is the end of the matter.

### III.  CONFRONTATION CLAUSE

Stephens also argues that the trial judge's refusal to allow defense counsel to reopen his cross-examination of Washington violated Stephens's rights under the Confrontation Clause of the Sixth Amendment. U.S. Const. amend. VI (guaranteeing right of criminal defendant "to be confronted with the witnesses against him"). The Supreme Court long has recognized that "a primary interest secured by [the Confrontation Clause] is the right of cross-examination." Douglas v. Alabama, 380 U.S. 415, 418 (1965). The reason is simple: "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis, 415 U.S. at 316.

In order to safeguard the defendant's rights under the Confrontation Clause, we have held that the trial judge may not so restrict cross-examination as to deprive the defendant of the "constitutionally required threshold level of inquiry," United States v. Tracey, 675 F.2d 433, 437 (1st Cir. 1982), and must give the accused "sufficient leeway to establish a reasonably complete picture of the witness's veracity, bias, and motivation," United States v. Laboy-Delgado, 84 F.3d 22, 28 (1st Cir. 1996) (internal quotation marks omitted). Stephens argues that the trial judge violated that directive here by refusing defense counsel's request to re-open his cross-examination of Washington in order to question her about her criminal history.

Although Stephens presented his Confrontation Clause claim in his state appeal, it is unclear whether the Massachusetts Appeals Court actually decided the federal constitutional issue. Rather, it appears that the court addressed the alleged error largely as a matter of state law. See Stephens I, 693 N.E.2d at 720. Stephens argues, therefore, that we should review his Confrontation Clause claim de novo rather than under the deferential "contrary to or unreasonable application of" standard set out in § 2254(d)(1). See Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001) ("[W]e can hardly defer to the state court on an issue that the state court did not address."). The district court appears to have taken the same view. In rejecting Stephens's claim, the court did not mention the Appeals Court's decision, but

-33-

simply concluded that Stephens had not stated a violation of the Confrontation Clause.  See Stephens II, 2001 WL 92269, at *7.

We need not dwell on the proper standard of review because we agree with the district court that Stephens's claim is without merit.  "'[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (quoting Delaware v. Fernsterer, 474 U.S. 15, 20 (1985) (per curiam)); accord United States v. Abel, 469 U.S. 45, 50 (1984) (stating that "the Confrontation Clause of the Sixth Amendment requires a defendant to have some opportunity to show bias on the part of a prosecution witness").  Here, the court ruled prior to trial that Stephens's counsel could cross-examine Washington as to her criminal history, including the charges pending against her at the time of the incident.  Due to his unfortunate memory lapse, counsel did not take advantage of that opportunity.  Although we agree with the Massachusetts Appeals Court that the "better practice" would have been to permit Stephens's attorney to correct his error by reopening cross-examination, Stephens I, 693 N.E.2d at 720, the court was not constitutionally compelled to give counsel that second chance.

The Confrontation Clause requires the trial court to give the defendant the opportunity to confront adverse witnesses and "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the

-34-

witness." Van Arsdall, 475 U.S. at 680 (internal quotation marks omitted). It does not require the court to reopen cross-examination so that defense counsel can pursue a line of questioning that was available when the witness testified initially. That is especially true here, since the court indicated that it would permit Stephens to recall Washington as his own witness. Cf. United States v. Medina, 992 F.2d 573, 581 n.2 (6th Cir. 1993) (finding that trial court did not abuse its discretion in refusing to re-open cross-examination of government witnesses, "particularly when it told counsel they could recall witnesses if they wished"). Counsel's decision to forego that opportunity, while relevant to Stephens's claims of ineffective assistance, has no bearing on the Confrontation Clause issue.

## IV.  CONCLUSION

Having concluded that the Massachusetts Appeals Court's ruling on Stephens's claim of ineffective assistance of counsel did not constitute an unreasonable application of federal law, we must reverse the district court's decision granting relief under 28 U.S.C. § 2254 and ordering a new trial. We affirm the judgment of the district court insofar as it rejected Stephens's Confrontation Clause claim.

**Affirmed in part and reversed in part**.