BARKETT, Circuit Judge
dissenting:
Two witnesses tentatively identified Leonard Wellington as the man who robbed a Rite Aid store in Vero Beach, Florida, on April 8, 1995. On cross-examination, important questions were raised as to the reliability of these identifications. The state presented no additional evidence linking Wellington to the crime, and the defense rested on the argument that the state had failed to carry its burden. Despite the close case submitted to the jury, the majority finds no prejudice to Wellington in the failure of his counsel to present a readily available alibi defense. Wellington’s jury was more discerning: it first reported that it was deadlocked four to two, and subsequently returned with a guilty verdict only after being advised to “try to reconcile your thoughts and reach a verdict if you can.” In light of the weakness of the government’s case, I am not at all confident that the same verdict would have been returned had the jury known of Wellington’s alibi. I would accordingly grant Wellington the writ of habeas corpus he seeks.
I.
Since losing his appeal, Wellington has pressed a single claim in state and federal courts. He argues that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment as a result of his trial counsel’s accidental failure to call either or both of his parents to testify that he was at home in Fort Lauderdale, at least two hours from Vero Beach, on the night of the robbery. At a post-conviction evidentiary hearing held pursuant to Wellington’s motion under Rule 3.850 of the Florida Rules of Criminal Procedure, Wellington’s trial counsel testified that the only reason he did not call Wellington’s mother was that he had failed to comply with Rule 3.200 of the Florida Rules of Criminal Procedure, which authorizes the exclusion of alibi evidence if a defendant fails to provide timely notice of alibi and a list of alibi witnesses. When, on the morning of *1264 trial, the prosecutor informed Wellington’s counsel she would object should he call his client’s mother, Wellington’s counsel decided to proceed rather than request a continuance or alternative remedy for the discovery violation. At the Rule 3.850 hearing, counsel admitted he had erred and stated that his handling of the alibi “was not a tactical decision.”[1] (R. Vol.2, Exh. 14, p. 20).
I agree with the majority that we may grant habeas relief if the state court’s ruling was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). In making the “unreasonable application” inquiry, we ask whether the state court’s application of clearly established federal law was objectively unreasonable. Williams v. Taylor, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[2]
As the majority recognizes, the “clearly established Federal law” that is relevant in this case is provided by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Although the majority correctly states Strickland’s “reasonable probability” standard, it bears emphasizing that this standard does not require the defendant to show that “but for counsel’s errors, the outcome of the proceeding would more likely than not have been different.” Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir.1986). Rather, Wellington has met his burden of showing a reasonable probability of a different outcome if we cannot confidently say the case against him could have withstood introduction of the alibi evidence. See id. at 1484.
*1265 Critical in assessing this likelihood are the infirmities in the state’s case. In failing to acknowledge the weakness of the evidence against Wellington, the majority disregards an elementary precept of the prejudice inquiry: our confidence in the verdict is necessarily less robust, and thus more readily undermined, the weaker the state’s case is. A “verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.” Strickland, 466 U.S. at 696, 104 S.Ct. 2052. When the government’s case is weak, therefore, the “potential prejudicial impact of counsel’s performance must be evaluated in light of that fact.” Johnson v. Baldwin, 114 F.3d 835, 838 (9th Cir.1997); see also Gonzalez-Soberal v. United States, 244 F.3d 273, 278 (1st Cir.2001) (“strength of the government’s case” is factor to be considered in making prejudice determination); Cooks v. Ward, 165 F.3d 1283, 1296 (10th Cir.1998) (“[i]n evaluating prejudice, we must keep in mind the strength of the government’s case”). A defense attorney’s unreasonable failure to present probative evidence in favor of his or her client will be more likely to prompt a finding of ineffective assistance when the state’s case is not overwhelming.
Also relevant to our prejudice inquiry is any indication of indecision on the part of jurors. Signs of jury deadlock militate in favor of holding infirmities at trial to have prejudiced the defendant. See United States v. Shavers, 615 F.2d 266, 269 (5th Cir.1980) (citing judge’s need to exhort deadlocked jury to try to reach a verdict in rejecting argument that prosecutor’s improper comment on defendant’s silence was harmless error)[3]; United States v. Jean-Baptiste, 166 F.3d 102, 109 (2d Cir.1999) (looking to indications of deadlock among jurors in holding wrongful admission of evidence not to have been harmless error).
II.
Applying these precepts, I cannot avoid the conclusion that the Rule 3.850 court’s application of Strickland to the facts of this case was objectively unreasonable. As presented to the jury, the evidence that Wellington robbed the Rite Aid ultimately boiled down to a single piece of testimony: Rite Aid clerk Vivian Gehringer’s assertion that she knew Wellington was the man who robbed her after he repeated the words “don’t make me hurt you” at a lineup. (R. Vol.2, Exh. 5, pp. 76-77, 82-83). Considered against the rest of the evidence at trial, I think it objectively unreasonable to conclude that Gehringer’s professed certainty would have assured Wellington’s conviction had jurors heard his alibi evidence.
First, the circumstances of Gehringer’s voice-based identification raised concerns about the possibility of a misidentifieation. As the jury was correctly informed, the lineup was conducted almost two months after the robbery. Gehringer admitted at trial that she had earlier failed to identify Wellington from a photo line-up. At the live line-up, the reason she asked authorities to have Wellington and one other man repeat the threatening phrase, which she remembered from the robbery, was that she was unable to make an identification based on physical appearance alone. In fact, Gehringer admitted that she eliminated four members of the line-up not on the basis of facial structure, skin color, or distinguishing characteristics, but simply by reference to “the shape and the size that I remember.” (R. Vol.2, Exh. 5, p. 82). Of *1266 the two men she asked to repeat the phrase “don’t make me hurt you,” one spoke with a Spanish accent, which almost certainly led Gehringer to conclude that she must choose Wellington or no one.
More importantly, Gehringer’s voice identification cannot have struck the jury with overwhelming force in the context of the trial as a whole, which provided jurors with strong reason to doubt the reliability of both Gehringer’s identification and that of the only other eyewitness. Despite Gehringer’s testimony that she relied on her memory of the robber’s build in excluding four members of the lineup, she testified at trial that she initially gave police a description of a suspect weighing about 185 pounds — significantly heavier than Wellington, who weighed 150 pounds. The only other eyewitness to identify Wellington, John Locke, testified that he had initially told police the man he encountered weighed at least 200 pounds; Locke himself weighed roughly 200 pounds at the time. Furthermore, both Gehringer and Locke reported that the robber stood between six feet and six feet two inches tall, whereas Wellington is five ten.
To be sure, these discrepancies did not prevent Gehringer and Locke from insisting at trial that they were confident Wellington was the assailant. As discussed above, Gehringer defended her identification by emphasizing her certainty of the match between Wellington’s voice and the robber’s.[4] Locke, however, suffered fairly dramatic impeachment after insisting he was “100 percent” certain Wellington was the right man. (R. Vol.2, Exh. 5, p. 36). Defense counsel asked Locke, who is four inches taller than Wellington, to stand face-to-face with the defendant at a distance of about 18 inches, the same distance Locke reported having stood from the suspect on the date of the crime. Counsel then asked whether Locke could explain his earlier statement that he and the robber were about the same height, forcing Locke to admit that “[h]eight-wise I might not have been correct on it.” (Id. at 39). Additional impeachment drew attention to Locke’s earlier estimate of the assailant’s weight as exceeding 200 pounds. Finally, counsel elicited Locke’s equivocal statement at the lineup, “if I had to pick somebody, I’d pick ¡Wellington].” (Id. at 44).
Both Locke and Gehringer provided reasonably similar accounts of the suspect’s somewhat distinctive clothing, agreeing that he was well-dressed in a copper or brown shirt with an unusual collar. The concordance of these accounts was ultimately of little probative value, however, because the state never linked this clothing to Wellington. The only relevance of the matching clothing description was its tendency to prove that Locke, who was not an eyewitness to the robbery itself, had encountered the robber shortly before the *1267 crime’s commission in a Publix store located in the same shopping plaza. The jury may well have believed the man Locke met to have been the robber, but the discrepancies between Locke’s description and Wellington’s appearance substantially undermined the significance of this proof.[5]
Finally, the jury may have been struck by the absence of testimony from several additional eyewitnesses mentioned at trial by eyewitness Gehringer, Publix employee Cynthia Waring, and Detective Molly McIntyre. Gehringer described a sustained interaction between the robber and Rite Aid employee Colleen Fahey, stating that the robber asked Fahey whether she had children and Fahey answered him. Despite hearing the robber speak, Fahey never testified at trial. To the contrary, Detective McIntyre acknowledged in her own testimony that Fahey was unable to identify anyone in either the photo or the live lineup; in fact, Fahey affirmatively stated that the person who committed the robbery was not in the lineup. The jury was likewise left to speculate as to why Waring, who recounted a colloquy between herself and the alleged robber as she sold him a pair of sunglasses, never identified Wellington as the man in question. Testifying witnesses also referred to an additional Publix employee, named Robert Kimbra or Kimber, who encountered the alleged robber at the same time as Locke. (R. Vol.2, Exh. 5, pp. 16, 52-53). Yet the state never offered the jury any account of this witness’s nonappearance. Finally, just as the state failed to produce a number of witnesses who might have been expected to identify Wellington, it failed to produce any physical evidence linking Wellington to the crime.
At the end of the state’s case, therefore, the jury had before it a closely joined contest in which a single issue, identification, would determine the verdict. As it happened, the jury had a difficult time reaching a decision. After deliberating for about an hour and a half, it reported that it was deadlocked. The judge then administered a charge using language similar to that approved in Allen v. United States, 164 U.S. 492, 501-02, 17 S.Ct. 154, 41 L.Ed. 528 (1896), exhorting jurors as follows: “You should consider each other’s views and try to reconcile your thoughts and reach a verdict if you can. So please deliberate until you feel you cannot agree on a verdict.” (R. Vol.2, Exh. 5, pp. 177-80). Only after deliberating for another hour and a half did the jury return with a guilty verdict.
It is against this context that prejudice resulting from the deficient performance of Wellington’s counsel must be considered. Wellington’s attorney could have introduced the testimony of Wellington’s mother and father, Mary Ann Allen and Dr. Herman Allen, that their son was at home in Fort Lauderdale, at least two hours from the scene of the crime, on the evening in question. It is of course true that the Allens’ interest in seeing their son acquitted would have provided the state with an effective line of impeachment. But testimony adduced at the Rule 3.850 hearing shows -that the Allens, and Mary Ann in particular, would not have been silenced by interrogation along these lines. Throughout the course of her cross-exami *1268 nation at the Florida Rule 3.850 hearing, Mary Ann Allen was steadfast in maintaining that she clearly recalled her son’s presence at home on April 8, 1995, a Saturday, because they had a discussion about attending Palm Sunday services the next morning.[6] (R. Vol.2, Exh. 14, pp. 45-46, 55). She also described keeping a calendar of Wellington’s coming and goings for the purpose of responding honestly to inquiries from his probation officer..
III.
In light of the substantial weaknesses in the state’s case and the existence of potentially decisive alibi evidence, I think it unreasonable to reject Wellington’s claim that presentation of his alibi would have created a reasonable probability of acquittal. With the reliability of eyewitness identifications looming so large, deliberations seem virtually certain to have cam vassed the question of why there was no evidence as to where Wellington was on the night of the robbery. Indeed, we know from the court’s modified 'Allen charge that the jury did struggle with the task before it. Even without such indications of deadlock, we have previously found prejudice in an attorney’s failure to present an alibi when the state produced not only two eyewitness identifications but also the inculpatory testimony of an alleged accomplice. See Code, 799 F.2d at 1484.
The majority nonetheless concludes there is no reasonable probability that alibi testimony would have changed the outcome of Wellington’s trial. In support of this assertion it reasons that because Wellington’s mother “likely ... would have disclosed Wellington’s, prior conviction,” her testimony would have caused “damage to his defense [that] would have outweighed any questionable value her alibi testimony would have provided.” Majority Opinion at-1265 n. 3. This remark is both misguided and unpersuasive.
It is misguided in that it implies our inquiry into prejudice under Strickland may take account of the possibility that Wellington’s jury would have convicted him on the basis of improper inferences drawn from the plain disclosure of a prior conviction. Such inferences are forbidden undér the Federal Rules of Evidence, which propound a variety of strictures that aim to reduce the danger they will be drawn. See Fed.R.Evid. 404(b) (barring evidence of uncharged crimes when offered “to prove the character of a person in' order to show action in conformity therewith”); compare Fed.R.Evid. 609(a) (barring admission of defendant’s prior conviction' unless judge determines that “the probative value of admitting this evidence outweighs its prejudicial effect”) with Fed.R.Evid. 403 (allowing admission of other types of potentially prejudicial evidence so long as prejudice does not “substantially outweigh[]” probative value); see also Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (finding abuse of discretion in trial court’s refusal to allow defendant to stipulate to prior felony conviction so as to keep jury from learning of prior assault similar to one charged). It has been established since the Supreme Court’s decision in Strickland that our inquiry into prejudice must presume the trier of fact to comply with the dictates of law. As the Supreme Court then stated:
The assessment of prejudice should proceed on the assumption that the deci- *1269 sionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel’s selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.
Strickland, 466 U.S. at 695, 104 S.Ct. 2052. More recently, the Supreme Court has reiterated this point, clarifying that the prejudice inquiry excludes “considerations that, as a matter of law, ought not inform the inquiry.” Williams, 529 U.S. at 393 n. 18, 120 S.Ct. 1495 (quoting Lockhart v. Fretwell, 506 U.S. 364, 373, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (concurring opinion of O’Connor, J.)).[7] Our prejudice inquiry properly concerns itself with the weight of competent evidence that was presented at trial or that would have emerged had counsel not performed deficiently. It does not credit the possibility, real though it may be, that a defendant would have been convicted as a result of a propensity the law aspires to contain.
Moreover, even were the majority correct in weighing the possibility that jurors would have relied on improper considerations, its observation regarding how Wellington’s prior conviction factors into the prejudice inquiry is less than compelling. The majority offers no support for its assumption that Mary Allen’s reference to her son’s probationary status would have enabled the state to elicit information about his prior conviction. Since Wellington was not himself testifying, the conviction could not be admitted as evidence of his own credibility. Nor is there any suggestion that the conviction would be admissible as relevant to a question, such as intent, identified by Federal Rule of Evidence 404(b) as an independent basis for admitting evidence of prior crimes and bad acts. There is likewise no indication in the record of any legitimate basis for the introduction of evidence regarding the nature of the crime underlying the conviction, nor does the state argue that one exists. As to Wellington’s probationary status itself, Mary Allen’s candor regarding why she paid close attention to her son’s comings and goings might well have counter-balanced curiosity among jurors as to Wellington’s prior misadventures.
The majority admits that disclosure of Wellington’s probationary status might have served to bolster Mary Allen’s credibility and thus Wellington’s alibi, characterizing the question as “clearly debatable.” Yet the majority then employs this characterization to support the conclusion that the Rule 3.850 court’s finding was not objectively unreasonable. Majority Opinion at 1265 n. 3. This pat solution to the doubt raised by Allen’s post-trial testimony fails to come to grips with the reality that Wellington’s guilt was “clearly debatable” well before he brought his alibi to the attention of the courts. The case against Wellington was too close, and too focused on the question of identity, to assume away the potentially decisive impact of an alibi *1270 by summarily dismissing Allen’s alibi testimony as being of “questionable value.”
I recognize that 28 U.S.C. § 2254(d)(1) requires us to determine not whether the Florida post-conviction court’s prejudice-determination was incorrect but whether it was objectively unreasonable. Bell v. Cone, 585 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing Williams, 529 U.S. at 409-10, 120 S.Ct. 1495). In my view, however, the doubt cast at trial upon the eyewitness identifications — and thus the entirety of the state’s case — shows the post-conviction court’s application of Strickland’s prejudice prong to have been objectively unreasonable in this case. When the prejudice inquiry is undertaken, as it must be, in light of the weakness of the state’s case and the indications of jury deadlock, a reasonable probability that Wellington’s alibi evidence would have led to a different result must be recognized.
For the foregoing reasons, I would reverse the decision of the district court and grant the writ of habeas corpus.

. The majority cites language from Tarver v. Hopper, 169 F.3d 710, 716 (11th Cir.1999), to the effect that a lawyer’s “admissions of deficient performance” were not persuasive. Majority Opinion at 1261. It should be noted that this language did not state a general rule regarding the credibility of attorney admissions, but referred specifically to the admission of a particular attorney under particular circumstances. Nor did the Court in Tarver deem the attorney's admission to lack credibility; rather, it simply was not persuaded that counsel’s performance had been deficient as a matter of law, despite the attorney’s admission of having prepared inadequately. See Tarver, 169 F.3d at 716. The majority also characterizes as "contradictory” the statement of Wellington’s trial counsel that he "thought [he] was making the best decision for [his] client” in proceeding to trial without the alibi. Counsel’s remark appears to be simply an affirmation of good faith. Rather than contradict his statement denying the exercise of strategic judgment, it explains that his failure to present the alibi defense was an honest mistake.
The majority’s citation of Taiver and its close parsing of testimony from Wellington’s counsel is symptomatic of its broader tendency to defend counsel's performance despite expressly resolving, see Majority Opinion at 1261 n. 1, not to discuss this component of the ineffective assistance test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). For example, the majority dwells upon assistant state attorney Nikki Robinson Morgan’s testimony at Wellington’s Rule 3.850 hearing, in which she commented favorably upon the performance of Wellington’s attorney at trial. Majority Opinion at 1262-63. Such asides are irrelevant. The Rule 3.850 court did not hesitate to find that counsel’s performance fell below an objective standard of reasonableness, and its determination in this regard was not questioned in either the Magistrate’s Report or the district court order denying relief.

. In this respect, the district court did not employ the correct standard. Relying on the Fifth Circuit's decision in Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), and our decision in Neelley v. Nagle, 138 F.3d 917 (1998), the magistrate judge found that "an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect.” Magistrate’s Report and Recommendation at 7 (quoting Drinkard, 97 F.3d at 769.) That formulation of the inquiry was overruled by the Supreme Court in Williams.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

. Standing alone, Gehringer's statement of confidence in her voice identification may or may not have impressed the jury. Yet the Rule 3.850 court's finding that Wellington does in fact have a distinctive voice is inappo-site because there is no indication in the record that the jury ever heard his voice. In citing the state court’s finding with approval, the majority fails to consider that Wellington never testified at trial. Nor would introduction of his alibi defense necessarily have occasioned his testimony. Therefore, in assessing whether the alibi defense would have created a reasonable probability of acquittal, we may have reference only to Gehringer’s uncorroborated insistence that Wellington’s voice matched that of the robber.
Even assuming the jury was impressed by Gehringer’s uncorroborated statements of certainty, it is extremely difficult to remain confident that jurors relying on this single shred of proof would not have been troubled by introduction of the alibi evidence. For this reason I believe we must find the state court to have reached an objectively unreasonable conclusion in determining that the alibi evidence does not present a reasonable probability of a different outcome.

. A similar point applies to testimony from witnesses Cynthia Waring and Jean Wade, employees at Publix and Rite Aid respectively, which linked a small paper bag recovered from the Rite Aid with a Publix bag used in a sale of sunglasses to the man encountered by Locke shortly before the robbery. This testimony of Waring and Wade tended only to prove that this man was the robber. But since Locke’s identification of Wellington as the man who bought the sunglasses was itself uncertain, the testimony from Waring and Wade was of little value.

. The prosecutor at Wellington's trial, Nikki Robinson Morgan, testified at the Rule 3.850 hearing that April 8th was in - fact the day before Easter, not Palm Sunday. (R. Vol.2, Exh. 14, p. 91). This contention was mistaken. See The World Almanac and Book of Facts 2002, at 686 (identifying Easter Sunday as falling on April 16, 1995).

. These remarks are fully applicable to the question before us, even though the quoted language emerged out of defendants' efforts to establish prejudice on the basis of a failure by counsel to take advantage of a "windfall” opportunity created by a court’s mistake of law. See Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The Court’s language refers not simply to the possibility of an improper acquittal, but to the prejudice inquiry as such. This broad framing of the rule is wholly appropriate, since the state obviously has no more claim than a defendant to an outcome that rests on a deci-sionmaker’s lawlessness.