STATE OF MAINE                          SUPERIOR COURT
AROOSTOOK, ss                           DOCKET NO. AROCD-CR-19-128

DAVID SULLIVAN                )
              Petitioner      )
                              )
                              )
                              )
                              )
vs                            )                  DECISION
                              )
                              )
                              )
STATE OF MAINE                )
              Respondent      )


## BACKGROUND

Pending before the court is David Sullivan's Petition for Post-Conviction Relief. By an Indictment dated March 6, 2014, Sullivan was charged with the following: Count 1- Unlawful Possession of Scheduled Drugs, 17-A, MRSA §1107-A(1)(B)(3), Class C; Count 2- Unlawful Possession of Scheduled Drugs, 17-A MRSA §1107-A(1)(B)(4), Class C; Count 3- Unlawful Trafficking of Scheduled Drugs, 17-A MRSA §1103(1-A)(A), Class B; and Count 4-Aggravated Trafficking in Scheduled Drugs, 17-A MRSA §1105-A(1)(I), Class A. However, Count 3 and Count 4 were actually the same charge, Count 4 being the elevated offense based upon volume. Trial was held on January 23 through January 25, 2017. Counts 1, 2 and 3 were presented to the jury, and as for Count 4, the jury was presented a single interrogatory asking the jury to determine whether the trafficking involved 300 or more pills. On January 25, 2017 the jury returned a verdict of guilty on all charges, and found with the trafficking charge more than 300 pills had been involved. On February 10, 2017 Sullivan was sentenced to 12 years, with all but 4 years suspended on Count 4, with concurrent sentences of 1 year on Counts 1 and 2; Count 3 was

As to the first prong of the test, counsel's representation falls below the objective standard of reasonableness if it falls below what might be expected from an ordinary fallible attorney. *Philbrook,* ¶ 7. Judicial inquiry into the effectiveness is highly deferential, and the post-conviction court must make every effort to eliminate the distorting effects of hindsight. *Id.* In Roberts v. State of Maine, 2014 ME 125, ¶23,103 A.3d 1031,1039, the Law Court indicated that in order to prove that counsel's performance was constitutionally deficient,

> "a defendant must show that counsel's representation fell below an objective standard of reasonableness. The question is whether the counsel's performance fell within the wide range of reasonable professional assistance that a competent criminal defense counsel could provide under prevailing professional norms. The *Strickland* test compels us to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time." (Internal citations and punctuation omitted.)

As to the second prong, whether prejudice is established, a petitioner must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, meaning that the ineffective assistance of counsel rose to the level of compromising the reliability of the conviction and undermining confidence in it. *Philbrook,* ¶ 8; citing *Theriault v. State,* 2015 ME 137, ¶¶ 19, 25. A conviction may be unreliable and not worthy of confidence, thus satisfying the "reasonable probability" test, even without proof that a different outcome was "more likely than not", as the now superseded "outcome determinative" test would require. *Id.* The "reasonable probability" test is different from an "outcome-determinative" standard, which is the quantitative inquiry that would require proof "that counsel's deficient conduct more likely than not altered the outcome in the case." *Theriault,* ¶20. Rather, the court's analysis must be qualitative in nature-that is to determine whether the petitioner has demonstrated that trial counsel's performance undermines confidence in the

3

outcome of the case and renders that outcome unreliable. *Theriault*, ¶19. "..the result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Theriault*, ¶20, citing *Strickland*, 466 U.S., at 694.

## DISCUSSION

*1. Outcome of trial, including choosing not to plead, to proceed to trial, and not to testify.*

The primary argument made by Sullivan is his attorney failed to recognize he is intellectually impaired and of questionable competence. And Sullivan alleges a consequence of his impaired intellect and questionable competence was he was unable to appreciate the risk of going to trial or benefits of plea bargaining. Sullivan also alleges his attorney failed to properly advise him of his right to testify. Finally, Sullivan argues his attorney failed at sentencing to advocate that these impairments be considered by the court in rendering a sentence.[1]

The court agrees that the testimony of Dr. Logue and her report presents Sullivan as a defendant with cognitive limitations. He dropped-out of school after the 9th grade and never obtained a GED. Sullivan's scores in the neuropsychological testing performed by Dr. Logue, which tested his intellectual functioning, comprehension, memory, and executive function, indicate he is in the low to borderline impaired level, and has the reading level of a second grader. And Dr. Logue testified Sullivan has poor complex reasoning skills which would make it difficult for him to grasp complex legal concepts and how they apply to him. Based on those assessments, Dr. Logue opines Sullivan did not appreciate the benefits of plea bargaining with his case. For example, Dr.

---

[1] Advocacy at sentencing will be addressed in section 2.

4

Logue testified Sullivan could not grasp the concept of plea bargaining his case to get less time in jail because he was not in jail at the time. She also accepted Sullivan's statements to her that if he took a plea offer he would be sentenced to one year in jail.

On the other hand, Dr. Logue testified Sullivan had a basic understanding of the charges, that he would go to jail if found guilty, and knew generally what plea bargaining was. And she indicated his emotions played a large role in how he communicated. However, Dr. Logue also acknowledged that Sullivan always maintained his innocence, and had very strong opinions about both his innocence and distrust of police and lawyers.

It is the court's sense that some level of Dr. Logue's opinion of Sullivan's failure to appreciate the benefits of plea bargaining arises from her belief that he should have recognized the State's case was strong and a plea bargain would reduce have reduced his jail time. But what is also just as possible is Sullivan simply had strong views about his innocence. In fact at the hearing, Sullivan testified that under no scenario would he have pleaded guilty, and he told this to his lawyer. This is consistent with Dr. Logue's testimony that at her interview of Sullivan, he never acknowledged guilt and always maintained his innocence.

The court also notes that Dr. Logue's suggestion that Sullivan never understood the plea bargain process seems to be based, at least in part, in her view that the State's case was strong. This was a belief she had without reviewing the police reports. At the same time, Dr. Logue testified that she agreed Sullivan was an individual with strong opinions and not easily swayed. The court feels that Dr. Logue's opinions fail to adequately account for the possibililty that Sullivan was

5

not interested in a plea bargain for the basic reason he simply believed he would not be found guilty.

With that in mind, the court will briefly address the facts presented at trial. At trial the evidence indicated that a search of Sullivan's home was precipitated by an investigation of an Angel Nibby. A search warrant had been granted to search Nibby's residence which was co-owned and shared with Sullivan. Sullivan was present in the home when police arrived to conduct the search. Pursuant to a search of the interior of the home, evidence of drug trafficking was found including ledgers, two safes with a large amount of cash, a handgun and a large amount of oxycodone pills. The essence of Sullivan's defense to the possession and trafficking of oxycodone charges, Counts 2, 3 and 4, was that this was exclusively Nibby's enterprise, and there was no evidence directly connecting Sullivan to the oxycodone or other evidence suggestive of trafficking.

Frankly, Sullivan was not irrational to believe the State could have difficulty proving beyond a reasonable doubt criminal conduct on his part relative to the possession or trafficking in oxycodone. His defense pointed out there were no fingerprints or DNA, no confessions, and no drugs found directly on his person. The defense pointed out there was no evidence of drug buys. The defense pointed out that the money traced back to Nibby. And the defense showed that Sullivan had or was in the process of moving out of the residence and he already had another address. And the defense argued the State had become focused on Sullivan as a defendant because of Nibby's untimely death. So again, the court does not find irrational Sullivan's decision to proceed to trial and require the State to prove guilt beyond a reasonable doubt.

At the same time, the court remains confident with the jury's verdict. The jury had been instructed on "possession", including "constructive possession". The State presented proof establishing constructive possession, including his presence at the house at the time of the search, Nibby using his vehicle to go to Bangor to acquire drugs, and Nibby and Sullivan's shared financial situation. That evidence supports the jury's finding of Sullivan's guilt relative to the possession and trafficking in oxycodone, Counts 2, 3 and 4.

In addition is the evidence relative to the possession of methamphetamine charge, Count 1. As to that charge, the State had significantly stronger evidence. That evidence included Sullivan's delay in answering the door when law enforcement arrived. The door not being answered, law enforcement went to rear of the residence where they found on top of the snow, suggestive of recent placement, and directly outside a window of the residence, a bag containing scales, dried marijuana, other drug paraphernalia, and a prescription pill bottle with Sullivan's name but containing methamphetamine pills. This was compelling evidence of Sullivan's guilt to the possession of methamphetamine charge. But the court notes this was a Class C charge. The charge carrying the mandatory minimum four years of incarceration was Count 4, the elevated trafficking in oxycodone charge, which as the court has already discussed, was a more difficult case for the State to prove. So again, the court does not find irrational Sullivan's decision to proceed to trial.

The court does not take issue with Dr. Logue's opinions indicating Sullivan has some cognitive limitations and is poorly educated. But there is insufficient evidence to find he is, or was at trial, not competent. A criminal defendant must be capable of understanding the nature and object of

the charges and proceedings against him, of comprehending his own condition in reference thereto, and of conducting in cooperation with his counsel his defense in a rational and reasonable manner. *State v. Gerrier,* 2018 ME 160, ¶7. In his memorandum, Sullivan concedes he "..has a basic understanding of the charges against him and the legal process." And at this point in time, the court has now had the opportunity to hear directly from Sullivan to assist make its own assessment.

The first occasion was at trial, when prior to the close of evidence the court advised Sullivan of his right to testify. (Tr. Transcript, Vol. 2 of 3, pp. 145-46). Following the court's advisement, Sullivan was asked if he understood what had been explained; Sullivan responded "yeah". The court then asked what he wished to do, and Sullivan responded "no"; followed by "You're choosing not to testify?", to which Sullivan responded "No." Id. With all due respect to Dr. Logue's opinions, the court finds Sullivan knew he had a right to testify, and was knowingly and voluntarily choosing not to.

The next direct interaction the court had with Sullivan was when he testified at this hearing. To be sure, Sullivan testified he could not remember whether his trial counsel explained to him the charges or the mandatory minimums. The court finds this is selective memory. On the other hand, Sullivan testified to clearly remembering telling trial counsel he had been treated for mental health issues, that he was on Social Security disability, and that he wanted to testify at trial. He testified he told trial counsel he wanted to tell the jury why he didn't answer the door when police arrived, and why he was there, and that he had previously moved. And Sullivan testified that trial counsel told him ".. he could testify but recommend he not because of issues

8

with his attitude". Sullivan testified he accepted trial counsel's advice. In addition, Sullivan testified trial counsel told him to write down any questions he had, but because he has a hard time spelling he verbally relayed his questions. Sullivan also testified that he had been made a plea offer of one year to serve.[2]

With the benefit of Sullivan's testimony, the court can now make a number of observations and findings. First of all, although Sullivan may have some cognitive limitations, the court does not believe he is, or was at time of trial, incompetent. Sullivan demonstrated an ability to communicate and relay his views, and the court has no reason to believe he was unable to do this when interacting with trial counsel. Indeed, Sullivan testified he accepted the advice of his counsel not to testify, which based on the total record cannot be argued as improper advice. And Sullivan indicated that although he couldn't write down questions as trail counsel instructed, he instead simply verbally relayed his questions. Finally, at hearing Sullivan testified he could not imagine a scenario where he would have plead guilty, and essentially told his trial lawyer he would not plead guilty. Taking Sullivan's testimony as a whole, coupled with all other evidence, the court is satisfied that Sullivan did not want to plead guilty and he wanted a trial. And as previously discussed, based on the totality of the evidence presented at trial, this was not an irrational or illogical choice.

In summary, the court finds that there is not sufficient evidence to suggest Sullivan was not competent, or that Sullivan did not understand the charges, his condition or situation relative to

---

[2] Apparently after this hearing, counsel confirmed that an offer of one year to serve had been extended to Sullivan. His ability to recall that detail tends to further support his competence, but does not take away from the court's assessment, infra, that Sullivan rejected the offers because he wanted a trial.

those charges, or that he was unable to work with counsel in a rational and reasonable manner. To the contrary, the court finds Sullivan did understand the charges, that he appreciated his condition relative to those charges, and that he was able to work with his trial counsel. More specifically, to the allegations made by Sullivan in this petition, the court finds Sullivan's cognitive limitations did not unreasonably interfere with his ability to appreciate the charges, or make rational decisions relative to his defense and working with counsel.[3] The court further finds that Sullivan made a voluntary decision to proceed to trial, and did not want to plead. The court does not find that Sullivan's cognitive limitations unreasonably interfered with his decision to proceed to trial.

As previously discussed, based upon a review of the evidence at trial, having a trial, particularly relative to the possession and trafficking in oxycodone charges, was not irrational. That coupled with Sullivan's testimony at this hearing leads the court to conclude Sullivan wanted a trial. The court finds Sullivan's testimony that he was not aware of the mandatory minimums to be self-serving. But more importantly, the court declines to find that cognitive limitations impacted his ability to proceed to trial despite those mandatory minimums.

Finally, as to Sullivan's right to testify, as discussed, the court finds that, based on the colloquy at trial, which was further supported by his testimony at hearing, Sullivan understood he had a

---

[3] Sullivan also argues that trial counsel erred by failing to obtain or seek mental health records from Mari Cochran who Sullivan had recently seen. Those records still have not been presented to the court, but are briefly summarized in Dr. Logue's report. In Dr. Logue's report, she summarizes the Mari Cochran records as showing Sullivan being treated in 2011 and 2012 on five occasions for ongoing mood disorder, and also diagnoses of impulse control disorder, social phobia and antisocial personality disorder. The court fails to appreciate how, had trial counsel obtained these records, they would have been relevant or useful at trial, and perhaps would have only reinforced trial counsel's recommendation not to take the witness stand.

right to testify, that his trial counsel told him had that right, and on the advice of counsel he voluntarily chose not to.

The court appreciates that the State's case for the oxycodone charges was based on "constructive possession". Testimony from Sullivan at trial may have been able to target directly some of the circumstantial evidence of constructive possession. To this point, Sullivan cites *Gonzalez-Soberal v. United States,* 244 F.3d 273 (1st Cir. 2001). The claim of ineffective assistance of counsel in *Gonzalez-Soberal* was that counsel failed to use documentary evidence to impeach the government's witnesses. *Id.* In setting forth the standard of review regarding *prejudice*, the court indicated

> prejudice exists in a particular case when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is one "sufficient to undermine confidence in the outcome." On one end, it is not enough to show that the errors had "some conceivable effect on the outcome. Nor is it required, however, that the defendant prove that the errors were more likely than not to have affected the verdict. It is important to maintain the focus of an ineffectiveness inquiry on the "fundamental fairness of the proceeding.

*Gonzalez-Soberal,* 244 F.3d at 278. The *Gonzalez-Soberal* court went on to explain the factors to consider to make a prejudice determination, which can be paraphrased to include:

1. the strength of the government's case;

2. an evaluation of the effectiveness of the presentation of the defense absent the lacking evidence;

3. the potential impeachment value of the lacking evidence in undermining the government's case. *Id.*

Applying *Gonzales-Soberlas* to this case, Sullivan seems to assert trial counsel was ineffective in not allowing him to testify. Setting aside for the moment that Sullivan acknowledges he followed

11

trial counsel's advice not to testifying because of his attitude, his argument based on *Gonzales-Soberlas* does not carry merit. As previously discussed, the court accepts that the State's case for possession and trafficking in oxycodone was not overwhelming, it being based on circumstantial evidence to establish constructive possession. On the other hand, the State's case for possession of methamphetamine was strong, supported by finding a bag outside the residence that appeared to be recently thrown out from a window, which contained scales, other paraphernalia, and a prescription bottle containing Sullivan's name containing methamphetamine. That charge was particularly strong. The theme of the defense was there was no direct evidence connecting Sullivan to the evidence found inside the residence, which included ledgers, cash, safes, a handgun, other paraphernalia, and a large amount of oxycodone. The defense established there was no direct evidence, such as fingerprints or DNA connecting Sullivan to the drugs found in the home, no evidence of drug buys, or evidence of drugs on Sullivan's person or in his direct possession. The State's evidence towards constructive possession was Sullivan's co-ownership of and residing at the property, and his intermingled financial relationship with Nibby. Sullivan asserts he could have testified that he had moved out, that he was there to check on Nibby's dogs, and he didn't answer the door because it wasn't his home. At trial, trial counsel did introduce evidence that Sullivan was establishing a new residence at a different location. But having observed the trial, the court believes testimony from Sullivan that he was only there to check on the dogs and didn't answer the door because it wasn't his home would have rung hollow.

When police arrived and knocked on the door, Sullivan did not answer for an extended period. There were surveillance cameras in the dooryard. When going to the back of the residence, the

police found the bag containing a prescription bottle with Sullivan's name containing the methamphetamine, a bag which appeared to have recently been placed there. The testimony Sullivan indicates he would have given at trial would have most likely failed to offset the State's evidence, and would in no way explain why a prescription bottle with his name containing methamphetamine was found thrown outside a window.

On the other hand, had Sullivan testified, he would have been exposed to cross examination which would have included his financial dealings with Nibby, Nibby using his vehicle when she went to Bangor to acquire drugs, his name on the deed to the property, surveillance cameras in the yard, a delay in coming to the door, and the methamphetamine found in a prescription bottle bearing his name. Frankly, on this record, the court does not question trial counsel's advice to Sullivan not to testify, as what Sullivan would have offered had he testified is weak. But more to the points raised by Sullivan, the court finds that, for the reasons already articulated, Sullivan knowingly and voluntarily accepted trial counsel's advice not testify, and that his cognitive limitations did not unreasonably interfere with his making that decision.

With the above findings made, the court finds there is no prejudice in the outcome of these proceedings in which Sullivan was found guilty by the jury, which was preceded by Sullivan choosing not to plead and choosing to proceed to trial, and accepting the advice of counsel he not testify. Sullivan has not established a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Theriault,* 2015 ME 137, ¶ 19. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* For the reasons previously articulated, the court remains with the outmost

13

confidence in the outcome of the trial and verdict, and Sullivan has failed to establish otherwise, notwithstanding his cognitive limitations and poor education.[4]

*2. Advocacy at Sentencing*

Lastly, Sullivan argues trial counsel failed him at sentencing, particularly by failing to provide mitigating and favorable evidence regarding his mental health, which the court noted was missing. Now bear in mind, being convicted of a Class A Trafficking charge, Sullivan faced a mandatory minimum sentence of four years, unless he could establish a substantial injustice, that there would not be an adverse effect on public safety, and that his prospects for rehabilitation, background and attitude warranted a departure. Sullivan apparently is suggesting that had the court been presented with his counseling records, and knew all of the information that was presented through this proceeding, such as his cognitive and communication limitations as testified to by Dr. Logue, the court would have deviated from the mandatory minimums. The court disagrees.[5]

First of all, as for counseling records, Sullivan still has not presented to the court the mental health records he suggests are favorable. But the court assumes those records include the counseling records by Mari Cochran which were summarized by Dr. Logue in her report. Per that summary, Sullivan met with Mari Cochran five times in 2011 and 2012 for mood disorder, and was diagnosed with impulse control disorder, antisocial personality disorder and social

---

[4] As the court finds Sullivan has failed to establish prejudice, the court need not make further findings whether trial counsel's representation was below an objective standard of reasonableness but can never the less conclude that on this record Sullivan has not met his burden of proof.

[5] In determining prejudice, the court recognizes the analysis is qualitative in nature, and not quantitative, outcome determinative. *Theriault v State,* 2015 ME 137, ¶¶19, 20. Nevertheless, sentencing is somewhat a quantitative function, so the court feels it a helpful activity to review the sentence before finally assessing if confidence in the outcome is affected.

phobia. Had records been presented consistent with Dr. Logue's summary, they would have had no impact, being dated and stale for a sentencing done in 2017 for crimes occurring in 2013.

Secondly, the court has reviewed the findings made at the sentencing hearing on February 10, 2017. See Sentencing Hearing Transcript (S.H.Tr.), pp.19-31. In reaching its sentence, the court conducted the required Hewey analysis. Step 1 is setting the base sentence, which requires an objective analysis of how the particular crime was committed. It would not be impacted by subjective matters pertaining to Sullivan's history. The court set the base sentence at 10 years. See S.H.Tr. pp. 23-25.

Next, in Step 2 the court set the maximum sentence. Step 2 requires a subjective review of Sullivan's circumstances, and assessing aggravating and mitigating factors, then adjusting the base sentence accordingly. In this case, the court found that the aggravating circumstances outweighed the mitigating circumstances, and set the maximum sentence at 12 years. See S.H.Tr. pp.25-28. The court indicated the aggravating factors particularly influencing its decision were lack of responsibility, lack of remorse, and lack of presentation of what Sullivan intended to do moving forwarded. S.H.Tr. p.28, l.2-6. Information similar to that presented by Dr. Logue may have provided the court more insight to Sullivan's situation, but it would not have changed the circumstances that he had not (and still has not) taken responsibility or shown remorse. The court continues to find the aggravating factors outweigh the mitigating, and that a 12 year maximum sentence is in order.

Lastly, in establishing a sentence the court must make a determination whether to suspend a portion, and if so, how much. This is usually mostly a subjective analysis, but is somewhat more objective in this case given the mandatory minimums potentially serving as a floor.

As previously discussed, to deviate from the mandatory minimums the court must find by substantial evidence that:

1. imposition of the minimum will result in substantial hardship;

2. failure to impose the minimum will *not* have an adverse effect on public safety; **and**

3. failure to impose the minimum will not impair the effect of the mandatory minimums, **and** the court also finds that the defendant's background, attitude and prospects for rehabilitation and the nature of the victim and the offense indicate that imposition of the minimum would frustrate general sentencing purposes. See 17-A, M.R.S. §1252(5-A)(B).

The court addressed application of the mandatory minimums at the sentencing hearing. See S.H.Tr. pp. 28-30. The court discussed that it had not been presented with much information about what Sullivan's future may hold or his background. S.H.Tr. p. 30, l. 8-9. But as discussed at the sentencing hearing, the criteria for deviation are listed with the conjunctive word "and". The court stated at the sentencing that it could not find deviating from the minimums would not have an adverse effect on public safety, specifically referencing the deterrent effect of mandatory minimums. S.H.Tr. p.29, l. 13-24. And ultimately the court stated "..just looking at the total picture, this case, the facts of this crime, and the unique things about you, this does not strike me as a case where our legislature had intended for the court to consider suspending the mandatory minimums, which are supposed not to be suspended. S.H.Tr. p. 30, l. 10-14.

16

From a *quantitative* review, the court can easily state that presentation of counseling records or information about Sullivan's background would not have changed the result. But in determining if a petitioner has established prejudice, the court must perform a *qualitative* analysis of whether petitioner has demonstrated that trial counsel's performance undermines confidence in the outcome and that the outcome is unreliable. *Theriault,* ¶19,20.

Failure of trial counsel to present at sentencing counseling records or more detailed information about Sullivan's history does not undermine confidence in the sentence imposed. Significant factors resulting in a time to serve sentence of the mandatory minimums included the basic facts of the crimes Sullivan was convicted, the purpose of mandatory minimums, and that imposing a sentence less than the mandatory minimums would affect their purpose, particularly the deterrent effect. It is not anticipated deviating from the minimums be easy, they were imposed by the Legislature for a reason. So, on the total facts of this case, the court finds Sullivan has failed to establish prejudice, as from a qualitative analysis, confidence in the sentencing proceeding was not impaired by trial counsel's representation at the sentencing hearing.

Accordingly, Petitioner David Sullivan's Petition for Post-Conviction Relief is DENIED.

Dated: January 27, 2020

Justice, Superior Court

17